## INTERNATIONAL ASSOCIATION OF MACHINISTS ET AL. *v.* STREET ET AL.

No. 4. Argued April 21, 1960. Set for reargument June 20, 1960. Reargued January 17–18, 1961.—Decided June 19, 1961.

*Lester P. Schoene* and *Milton Kramer* reargued the cause and filed a brief for appellants. *Cleburne E. Gregory, Jr.* was with them on the jurisdictional statement.

*E. Smythe Gambrell* reargued the cause for appellees. With him on the briefs were *W. Glen Harlan, Charles J. Bloch* and *Ellsworth Hall, Jr.*

*Solicitor General Rankin* argued the cause for the United States as intervenor. With him on the brief were *Assistant Attorney General Doub, Morton Hollander* and *David L. Rose.*

Briefs of *amici curiae,* urging reversal, were filed by *Clarence M. Mulholland, Edward J. Hickey, Jr.* and *James L. Highsaw, Jr.* for the Railway Labor Executives' Association, and by *J. Albert Woll, Theodore J. St. Antoine* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

A group of labor organizations, appellants here, and the carriers comprising the Southern Railway System, entered into a union-shop agreement pursuant to the authority of § 2, Eleventh of the Railway Labor Act.[1] The agree-

---

[1] 64 Stat. 1238, 45 U. S. C. § 152, Eleventh. The section provides: "Eleventh. Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly desig-

ment requires each of the appellees, employees of the carriers, as a condition of continued employment, to pay the appellant union representing his particular class or craft the dues, initiation fees and assessments uni-

nated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided,* That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner.

"(c) The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee in engine, train, yard, or hostling service, that is, an employee engaged in any of the services or capacities covered in the First Division of paragraph (h) of section 153 of this title, defining the jurisdictional scope of the First Division of the National Railroad Adjustment Board, if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with

formly required as a condition of acquiring or retaining union membership. The appellees, in behalf of themselves and of employees similarly situated, brought this action in the Superior Court of Bibb County, Georgia, alleging that the money each was thus compelled to pay to hold his job was in substantial part used to finance the campaigns of candidates for federal and state offices whom he opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which he disagreed. The Superior Court found that the allegations were fully proved [2] and entered a judg-

---

this chapter and admitting to membership employees of a craft or class in any of said services; and no agreement made pursuant to subparagraph (b) of this paragraph shall provide for deductions from his wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership: *Provided, however,* That as to an employee in any of said services on a particular carrier at the effective date of any such agreement on a carrier, who is not a member of any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services, such employee, as a condition of continuing his employment, may be required to become a member of the organization representing the craft in which he is employed on the effective date of the first agreement applicable to him: *Provided, further,* That nothing herein or in any such agreement or agreements shall prevent an employee from changing membership from one organization to another organization admitting to membership employees of a craft or class in any of said services.

"(d) Any provisions in paragraphs Fourth and Fifth of this section in conflict herewith are to the extent of such conflict amended."

[2] The pertinent findings of the trial court are:

"(5) The funds so exacted from plaintiffs and the class they represent by the labor union defendants have been, and are being, used in substantial amounts by the latter to support the political campaigns of candidates for the offices of President and Vice President of the United States, and for the Senate and House of Representatives of the United States, opposed by plaintiffs and the class they represent, and also to support by direct and indirect financial contributions and expenditures the political campaigns of candidates for State

ment and decree enjoining the enforcement of the union-shop agreement on the ground that § 2, Eleventh violates the Federal Constitution to the extent that it permits such use by the appellants of the funds exacted from employees.[3]   The Supreme Court of Georgia affirmed, 215

and local public offices, opposed by plaintiffs and the class they represent.   The said funds are so used both by each of the labor union defendants separately and by all of the labor union defendants collectively and in concert among themselves and with other organizations not parties to this action through associations, leagues, or committees formed for that purpose.

"(6) Those funds have been and are being used in substantial amounts to propagate political and economic doctrines, concepts and ideologies and to promote legislative programs opposed by plaintiffs and the class they represent.   Those funds have also been and are being used in substantial amounts to impose upon plaintiffs and the class they represent, as well as upon the general public, conformity to those doctrines, concepts, ideologies and programs.

"(7) The exaction of moneys from plaintiffs and the class they represent for the purposes and activities described above is not reasonably necessary to collective bargaining or to maintaining the existence and position of said union defendants as effective bargaining agents or to inform the employees whom said defendants represent of developments of mutual interest.

"(8) The exaction of said money from plaintiffs and the class they represent, in the fashion set forth above by the labor union defendants, is pursuant to the union shop agreements and in accordance with the terms and conditions of those agreements."

[3] The trial judge concluded:

"Said exaction and use of money, said union shop agreements and Section 2 (eleventh) of the Railway Labor Act and their enforcement violate the United States Constitution which in the First, Fifth, Ninth and Tenth Amendments thereto guarantees to individuals protection from such unwarranted invasion of their personal and property rights, (including freedom of association, freedom of thought, freedom of speech, freedom of press, freedom to work and their political freedom and rights) under the cloak of federal authority."

The judgment and decree provided that the appellants and the carriers "be and they hereby are perpetually enjoined from enforcing the said union shop agreements . . . and from discharging petitioners, or any member of the class they represent, for refusing to

Ga. 27, 108 S. E. 2d 796.[4]    On appeal to this Court under 28 U. S. C. § 1257 (1), we noted probable jurisdiction, 361 U. S. 807.

## I.

### THE HANSON DECISION.

We held in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, that enactment of the provision of § 2, Eleventh authorizing union-shop agreements between interstate railroads and unions of their employees was a valid exercise by Congress of its powers under the Commerce Clause and did not violate the First Amendment or the Due Process Clause of the Fifth Amendment.    It is argued that our disposition of the First Amendment claims in *Hanson* disposes of appellees' constitutional claims in this case adversely to their contentions.    We disagree.    As appears from its history, that case decided only that § 2, Eleventh, in authorizing collective agreements conditioning em-

become or remain members of, or pay periodic dues, fees, or assessments to, any of the labor union defendants, provided, however, that said defendants may at any time petition the court to dissolve said injunction upon a showing that they no longer are engaging in the improper and unlawful activities described above." Judgment was also entered in favor of three of the named appellees for the amounts of dues, initiation fees and assessments paid by them.

[4] The Supreme Court of Georgia viewed the constitutional question presented for its decision as follows:

"The fundamental constitutional question is: Does the contract between the employers of the plaintiffs and the union defendants, which compels these plaintiffs, if they continue to work for the employers, to join the unions of their respective crafts, and pay dues, fees, and assessments to the unions, where a part of the same will be used to support political and economic programs and candidates for public office, which the plaintiffs not only do not approve but oppose, violate their rights of freedom of speech and deprive them of their property without due process of law under the First and Fifth Amendments to the Federal Constitution?" 215 Ga., at 43–44, 108 S. E. 2d, at 807.

ployees' continued employment on payment of union dues, initiation fees and assessments, did not on its face impinge upon protected rights of association. The Nebraska Supreme Court in *Hanson,* upholding the employees' contention that the union shop could not constitutionally be enforced against them, stated that the union shop "improperly burdens their right to work and infringes upon their freedoms. This is particularly true as to the latter because it is apparent that some of these labor organizations advocate political ideas, support political candidates, and advance national economic concepts which may or may not be of an employee's choice." 160 Neb. 669, 697, 71 N. W. 2d 526, 546. That statement was made in the context of the argument that compelling an individual to become a member of an organization with political aspects is an infringement of the constitutional freedom of association, whatever may be the constitutionality of compulsory financial support of group activities outside the political process. The Nebraska court's reference to the support of political ideas, candidates, and economic concepts "which may or may not be of an employee's choice" indicates that it was considering at most the question of compelled membership in an organization with political facets. In their brief in this Court the appellees in *Hanson* argued that First Amendment rights would be infringed by the enforcement of an agreement which would enable compulsorily collected funds to be used for political purposes. But there was nothing concrete in the record to show the extent to which the unions were actually spending money for political purposes and what these purposes were, nothing to show the extent to which union funds collected from members were being used to meet the costs of political activity and the mechanism by which this was done, and nothing to show that the employees there involved opposed the use of their

money for any particular political objective.[5]  In contrast, the present record contains detailed information on all these points, and specific findings were made in the courts below as to all of them.  When it is recalled that the action in *Hanson* was brought before the union-shop agreement became effective and that the appellees never thereafter showed that the unions were actually engaged in furthering political causes with which they disagreed and that their money would be used to support such activities, it becomes obvious that this Court passed merely on the constitutional validity of § 2, Eleventh of the Railway Labor Act on its face, and not as applied to infringe the particularized constitutional rights of any individual. On such a record, the Court could not have done more, consistently with the restraints that govern us in the adjudication of constitutional questions and warn against their premature decision.  We therefore reserved decision of the constitutional questions which the appellees present in this case.  We said: "It is argued that compulsory membership will be used to impair freedom of expression. But that problem is not presented by this record.  . . . if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this

---

[5] The record contained one union constitution with a statement of political objectives and various other union constitutions authorizing political education activity, lobbying before legislative bodies, and publication of union views.  There was an indication that *Labor* was furnished to members of some unions.  There was also material taken from the hearings on § 2, Eleventh which included statements of management opponents of the Act that union dues were used for political activities and employees should not be forced to join unions if they did not like the purposes for which their funds would be spent.  And there were statements by Rep. Hoffman of Michigan during the debate on the bill, warning union leaders not to levy "political assessments" and use the Act to force their members to meet those assessments.

judgment will not prejudice the decision in that case. For we pass narrowly on § 2, Eleventh of the Railway Labor Act. We only hold that the requirements for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments." *Id.*, p. 238. See also p. 242 (concurring opinion). Thus all that was held in *Hanson* was that § 2, Eleventh was constitutional in its bare authorization of union-shop contracts requiring workers to give "financial support" to unions legally authorized to act as their collective bargaining agents. We sustained this requirement—and only this requirement—embodied in the statutory authorization of agreements under which "all employees shall become members of the labor organization representing their craft or class." Clearly we passed neither upon forced association in any other aspect nor upon the issue of the use of exacted money for political causes which were opposed by the employees.

The record in this case is adequate squarely to present the constitutional questions reserved in *Hanson*. These are questions of the utmost gravity. However, the restraints against unnecessary constitutional decisions counsel against their determination unless we must conclude that Congress, in authorizing a union shop under § 2, Eleventh, also meant that the labor organization receiving an employee's money should be free, despite that employee's objection, to spend his money for political causes which he opposes. Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell*

v. *Benson,* 285 U. S. 22, 62. Each named appellee in this action has made known to the union representing his craft or class his dissent from the use of his money for political causes which he opposes. We have therefore examined the legislative history of § 2, Eleventh in the context of the development of unionism in the railroad industry under the regulatory scheme created by the Railway Labor Act to determine whether a construction is "fairly possible" which denies the authority to a union, over the employee's objection, to spend his money for political causes which he opposes. We conclude that such a construction is not only "fairly possible" but entirely reasonable, and we therefore find it unnecessary to decide the correctness of the constitutional determinations made by the Georgia courts.

## II.

### THE RAIL UNIONS AND UNION SECURITY.

The history of union security in the railway industry is marked *first,* by a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions; [6] *second,* by the declaration in 1934 of a congressional policy of complete freedom of choice of employees to join or not to join a union; *third,* by the modification

---

[6] "[T]hese railroad labor organizations in the past have refrained from advocating the union shop agreement, or any other type of union security. It has always been our philosophy that the strongest and most militant type of labor organization was the one whose members were carefully selected and who joined conviction and a desire to assist their fellows in promoting objects of labor unionism . . . ." Statement of Charles J. MacGowan, vice president of the International Brotherhood of Boilermakers, Transcript of Proceedings, Presidential Board, appointed Feb. 20, 1943, p. 5358. See also Transcript of Proceedings, Presidential Emergency Board No. 98, appointed pursuant to Exec. Order No. 10306, Nov. 15, 1951, pp. 835–845, Carriers' Exhibit W–28. For an analysis of the reasons for the long-time absence of pressure for union security agreements in the railway industry, see Toner, The Closed Shop, pp. 93–114.

of the firm legislative policy against compulsion, but only as a specific response to the recognition of the expenses and burdens incurred by the unions in the administration of the complex scheme of the Railway Labor Act.

When the question of union security in the rail industry was first given detailed consideration by Congress in 1934 [7] only one of the standard unions had security provisions in any of its contracts. The Brotherhood of Railroad Trainmen maintained a number of so-called "percentage" contracts, requiring that in certain classes of employees represented by the Brotherhood, a specified percentage of employees had to belong to the union. These contracts applied only to yard conductors, yard brakemen and switchmen, and covered no more than 10,000 workers, about 1% of all rail employees. See letter from Joseph B. Eastman, Federal Coordinator of Transportation, to Chairman of the House Committee on Interstate and Foreign Commerce, June 7, 1934, H. R. Rep. No. 1944, 73d Cong., 2d Sess., pp. 14–16; testimony of James A. Farquharson, legislative representative of the Brotherhood of Railroad Trainmen, Hearings on H. R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., pp. 94–105.

---

[7] The principle of freedom of choice had been incorporated in two earlier pieces of legislation governing railroads. The Bankruptcy Act of March 3, 1933, 47 Stat. 1481, § 77 (p) and (q), provided that no judge, trustee, or receiver of a carrier should interfere with employee organization, influence or coerce employees to join a company union, or require employees to join or refrain from joining a labor organization. The Emergency Railroad Transportation Act of June 16, 1933, 48 Stat. 214, § 7 (e), required all carriers to abide by these provisions of the Bankruptcy Act. The latter provision was temporary, with a maximum duration of two years. See testimony of Joseph B. Eastman, Federal Coordinator of Transportation, House Hearings on H. R. 7650, 73d Cong., 2d Sess., pp. 22–23, and his official interpretation of this legislation, 7 Interstate Commerce Acts Ann., 1934 Supp., pp. 5972–5973.

During congressional consideration of the 1934 legislation, the rail unions attempted to persuade Congress not to preclude them from negotiating security arrangements. By amendments to the original proposal, they sought to assure that the provision which became § 2, Fifth should prevent the carriers from conditioning employment on membership in a company union but should exempt the standard unions from its prohibitions. The Trainmen, the only union which stood to lose existing contracts if the section was not limited to company unions, especially urged such a limitation. See statement of A. F. Whitney, president, S. Rep. No. 1065, 73d Cong., 2d Sess., pt. 2, p. 2; see also 78 Cong. Rec. 12372, 12376.

The unions succeeded in having the House incorporate such a limitation in the bill it passed. See H. R. Rep. No. 1944, 73d Cong., 2d Sess. 2, 6; 78 Cong. Rec. 11710–11720. But the Senate did not acquiesce. Eastman, a firm believer in complete freedom of employees in their choice of representatives, strongly opposed the limitation. He characterized it as "vicious, because it strikes at the principle of freedom of choice which the bill is designed to protect. The prohibited practices acquire no virtue by being confined to so-called 'standard unions.' . . . Within recent years, the practice of tying up men's jobs with labor-union membership has crept into the railroad industry which theretofore was singularly clean in this respect. The practice has been largely in connection with company unions but not entirely. If genuine freedom of choice is to be the basis of labor relations under the Railway Labor Act, as it should be, then the yellow-dog contract, and its corollary, the closed shop, and the so-called 'percentage contract' have no place in the picture." Hearings on S. 3266, Senate Committee on Inter-

state Commerce, 73d Cong., 2d Sess., p. 157.[8]   Eastman's views prevailed in the Senate, and the House concurred in a final version of § 2, Fifth, providing that "[n]o carrier . . . shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization." See 78 Cong. Rec. 12369–12376, 12382–12388, 12389–12398, 12400–12402, 12549–12555.

During World War II, the nonoperating unions made an unsuccessful attempt to obtain union security, incidental to an effort to secure a wage increase. Following the failure of negotiations and mediation, a Presidential Emergency Board was appointed. Two principal reasons were advanced by the unions. They urged that in view of their pledge not to strike for the duration and their responsibilities to assure uninterrupted operation of the railroads, they were justified in seeking to maintain their positions by union security arrangements. They also maintained that since they secured benefits through collective bargaining for all employees they represented, it was fair that the costs of their operations be

---

[8] Eastman further emphasized that only the Trainmen were immediately affected by the broader prohibition he supported. "I am confident that the only real support for the proposed amendments is from a single organization. None of the other standard organizations has anything to gain from such changes in the bill." Eastman letter, *supra*, p. 16. For other expressions of Eastman's views, see House Hearings, *supra*, pp. 28–29; Hearings on H. R. 9861, House Rules Committee, 73d Cong., 2d Sess., pp. 22–24. That other rail unions were still committed at this time to the principle of voluntarism, despite their support of the Trainmen's position, is indicated by the statement of George H. Harrison, representing the Railway Labor Executives' Association: "Now, I hope the committee will not get the thought from these statements that the railroad labor unions that I speak for want to force these men into our unions, because that is not our purpose; . . . ." House Hearings on H. R. 7650, *supra*, p. 86.

shared by all workers. The Board recommended withdrawal of the request, concluding that the union shop was plainly forbidden by the Railway Labor Act and that in any event the unions had failed to show its necessity or utility. Presidential Emergency Board, appointed Feb. 20, 1943, Report of May 24, 1943; Supplemental Report, May 29, 1943. The Report said: "[T]he Board is convinced that the essential elements of the union shop as defined in the employees' request are prohibited by section 2 of the Railway Labor Act. The intent of Congress in this respect is made evident, with unusual clarity." Supplemental Report, *supra,* p. 29.[9] On the merits of the issue, the Board expressly rejected the claim that union security was necessary to protect the bargaining position of the unions: "[T]he unions are not suffering from a falling off in members. On the contrary, . . . membership has been growing and at the present time appears to be the largest in railroad history, with less than 10 percent nonmembership among the employees here represented." Supplemental Report, p. 31. "[T]he evidence presented with respect to danger from predatory rivals seemed to the Board lacking in sufficiency; especially so in the light of the evidence concerning membership growth." *Ibid.* "[N]o evidence was presented indicating that the unions stand in jeopardy by reason of carrier opposition. A few railroads were mentioned on which some of the unions do not represent a majority of their craft or class, and do not have bargaining relationships with the carrier. But the exhibits show that these unions are the chosen representatives of the employees on the overwhelming majority of the railroads,

---

[9] The Board's view as to the illegality of a union shop was supported by an opinion of the Attorney General, 40 Op. Atty. Gen., No. 59, p. 254 (Dec. 29, 1942).

and that recognition of the unions is general. The Board does not find therefore that a sufficient case has been made for the necessity of additional protection of union status on the railroads." *Id.*, p. 32. The unions acceded to the Board's recommendation.

The question of union security was reopened in 1950.[10] Congress then evaluated the proposal for authorizing the union shop primarily in terms of its relationship to the financing of the unions' participation in the machinery created by the Railway Labor Act to achieve its goals. The framework for fostering voluntary adjustments between the carriers and their employees in the interest of the efficient discharge by the carriers of their important functions with minimum disruption from labor strife has no statutory parallel in other industry. That machinery, the product of a long legislative evolution, is more complex than that of any other industry. The labor relations of interstate carriers have been a subject of congressional

---

[10] At the time of the congressional deliberations which preceded the enactment of the Labor Management Relations Act, 1947, the Trainmen, through their president, A. F. Whitney, advocated the closed shop, and urged the repeal of the provisions which prohibited it. Hearings on Amendments to the National Labor Relations Act, House Committee on Education and Labor, 80th Cong., 1st Sess., pp. 1549–1552, 1561. However, the Railway Labor Executives' Association opposed amendment of the 1934 Act. A. E. Lyon, executive secretary of the Association, said: "We want to make it very clear that we are proposing no amendments to the Railway Labor Act. We believe that none is necessary, and we are opposed to those which Mr. Whitney suggested." Hearings, p. 3722. Lyon added: "We are not asking you to amend the Railway Labor Act and provide a closed shop as Mr. Whitney did. We do not think it is necessary." P. 3724. In response to the query, "By the services you have performed for your members you have attracted people voluntarily to join. Is that not correct?" Lyon replied: "I think that is true. And many of our union people believe they would rather have members that belong because they want to, rather than because they have to." P. 3732.

enactments since 1888.[11]   For a time, after World War I, Congress experimented with a form of compulsory arbi-

---

[11] The Act of 1888, 25 Stat. 501, authorized the creation of boards of voluntary arbitration to settle controversies between carriers and their employees which threatened to disrupt transportation. § 1. The Act also provided for a temporary presidential commission to investigate the causes of a controversy and the best means of adjusting it; the commission was to report the results of its investigation to the President and Congress. § 6.

In 1898 Congress repealed the Act of 1888 and passed the Erdman Act, 30 Stat. 424, providing that "whenever a controversy concerning wages, hours of labor, or conditions of employment shall arise between a carrier subject to this Act and the employees of such carrier, seriously interrupting or threatening to interrupt the business of said carrier," the Chairman of the Interstate Commerce Commission and the Commissioner of Labor should attempt to resolve the dispute, at the request of either party, by conciliation and mediation. § 2. If these methods failed, a board of voluntary arbitration could be set up with representatives on it of the carrier and the "labor organization to which the employees directly interested belong . . . ." § 3. Section 10 of the Act also made it criminal for an employer to require an employee to promise not to become or remain a member of a labor organization or to discriminate against an employee for such membership, a provision which was held unconstitutional in *Adair* v. *United States,* 208 U. S. 161.

The Erdman Act was superseded in 1913 by the passage of the Newlands Act, 38 Stat. 103. It created a Board of Mediation and Conciliation to which either party to a controversy could refer the dispute and which could proffer its services even without request if an interruption of traffic was imminent and seriously jeopardized the public interest. The Board also was authorized to give opinions as to the meaning or application of agreements reached through mediation. § 2. The arbitration procedures set up by the Erdman Act were further elaborated. §§ 3–8.

In 1916 Congress imposed the 8-hour day on the railroads, 39 Stat. 721. During the period of federal operation of the railroads in World War I and afterwards the Federal Government executed agreements with many of the national labor organizations as representatives of the railroad employees. Boards of adjustment were also set up to handle disputes concerning the interpretation and applica-

tration.[12]   The experiment was unsuccessful.   Congress
has since that time consistently adhered to a regulatory
policy which places the responsibility squarely upon the
carriers and the unions mutually to work out settlements
of all aspects of the labor relationship.   That policy was
embodied in the Railway Labor Act of 1926, 44 Stat. 577,

tion of agreements. See Hearings on S. 3295, Subcommittee of
Senate Committee on Labor and Public Welfare, 81st Cong., 2d Sess.,
pp. 216, 305.   By the Transportation Act of 1920, 41 Stat. 456,
Congress terminated federal control and established an extensive
new regulatory scheme.   See n. 12, *infra*.   See generally Hearings on
S. 3463, Subcommittee of the Senate Committee on Labor and Public
Welfare, 81st Cong., 2d Sess., pp. 124–131.

[12] The Transportation Act of 1920 provided for a Railroad Labor
Board, with power to render a decision in disputes between carriers
and their employees over wages, grievances, rules, or working condi-
tions not resolved through conference and adjustment procedures.
§ 307.   In rendering a decision on wages or working conditions, the
Board had a duty to establish wages and conditions which in its opin-
ion were "just and reasonable."   § 307 (d).   It was held, however,
that the decisions of the Board could not be enforced by legal process.
See *Pennsylvania R. Co.* v. *United States Railroad Labor Board,* 261
U. S. 72; *Pennsylvania R. System* v. *Pennsylvania R. Co.,* 267
U. S. 203.   By 1926 the Board had lost the confidence of both the
unions and many of the railroads.   Commented the Senate Commit-
tee which considered the Railway Labor Act of 1926: "In view of the
fact that the employees absolutely refuse to appear before the labor
board and that many of the important railroads are themselves
opposed to it, that it has been held by the Supreme Court to have no
power to enforce its judgments, that its authority is not recognized or
respected by the employees and by a number of important railroads,
that the President has suggested that it would be wise to seek a sub-
stitute for it, and that the party platforms of both the Republican
and Democratic Parties in 1924 clearly indicated dissatisfaction with
the provisions of the transportation act relating to labor, the com-
mittee concluded that the time had arrived when the labor board
should be abolished and the provisions relating to labor in the trans-
portation act, 1920, should be repealed."   S. Rep. No. 606, 69th
Cong., 1st Sess.; pp. 3–4.

which remains the basic regulatory enactment. As the Senate Report on the bill which became that law stated: "The question was . . . presented whether the substitute [for the Act of 1920] should consist of a compulsory system with adequate means provided for its enforcement, or whether it was in the public interest to create the machinery for amicable adjustment of labor disputes agreed upon by the parties and to the success of which both parties were committed. . . . The committee is of opinion that it is in the public interest to permit a fair trial of the method of amicable adjustment agreed upon by the parties, rather than to attempt under existing conditions to use the entire power of the Government to deal with these labor disputes." S. Rep. No. 606, 69th Cong., 1st Sess., p. 4. The reference to the plan "agreed upon by the parties" was to "the fact that the Railway Labor Act of 1926 came on the statute books through agreement between the railroads and the railroad unions on the need for such legislation. It is accurate to say that the railroads and the railroad unions between them wrote the Railway Labor Act of 1926 and Congress formally enacted their agreement." *Railway Employes' Dept.* v. *Hanson, supra,* p. 240 (concurring opinion). See generally Murphy, Agreement on the Railroads—The Joint Railway Conference of 1926, 11 Lab. L. J. 823.

"All through the [1926] act is the theory that the agreement is the vital thing in life." Statement of Donald R. Richberg, Hearings on H. R. 7180, House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., pp. 15–16. The Act created affirmative legal duties on the part of the carriers and their employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise . . . ." § 2, First. See *Texas & N. O. R. Co.* v. *Brotherhood of*

*Railway & Steamship Clerks,* 281 U. S. 548. The Act also established a comprehensive administrative apparatus for the adjustment of disputes, in conferences between the parties, § 2, Second, Third and Fourth (now Sixth), and if not so settled, in submissions to boards of adjustment, § 3, or the National Mediation Board, § 4. And the legislation expanded the already existing voluntary arbitration machinery, §§ 7, 8, 9.

A primary purpose of the major revisions made in 1934 was to strengthen the position of the labor organizations *vis-à-vis* the carriers, to the end of furthering the success of the basic congressional policy of self-adjustment of the industry's labor problems between carrier organizations and effective labor organizations. The unions claimed that the carriers interfered with the employees' freedom of choice of representatives by creating company unions, and otherwise attempting to undermine the employees' participation in the process of collective bargaining. Congress amended § 2, Third to reinforce the prohibitions against interference with the choice of representatives, and to permit the employees to select nonemployee representatives. A new § 2, Fourth was added guaranteeing employees the right to organize and bargain collectively, and Congress made it the enforceable duty of the carriers "to treat with" the representatives of the employees, § 2, Ninth. See *Virginian R. Co.* v. *System Federation,* 300 U. S. 515. It was made explicit that the representative selected by a majority of any class or craft of employees should be the exclusive bargaining representative of all the employees of that craft or class. "The minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own, and its members cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining." *Steele* v. *Louisville*

*& N. R. Co.,* 323 U. S. 192, 200. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents . . . ." *Id.,* p. 202. In addition to thus strengthening the unions' status in relation to both the carriers and the employees, the 1934 Act created the National Railroad Adjustment Board and provided that the 18 employee representatives were to be chosen by the labor organizations national in scope. § 3. This Board was given jurisdiction to settle what are termed minor disputes in the railroad industry, primarily grievances arising from the application of collective bargaining agreements to particular situations. See *Union Pacific R. Co.* v. *Price,* 360 U. S. 601.

In sum, in prescribing collective bargaining as the method of settling railway disputes, in conferring upon the unions the status of exclusive representatives in the negotiation and administration of collective agreements, and in giving them representation on the statutory board to adjudicate grievances, Congress has given the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations in the industry. "It is fair to say that every stage in the evolution of this railroad labor code was progressively infused with the purpose of securing self-adjustment between the effectively organized railroads and the equally effective railroad unions and, to that end, of establishing facilities for such self-adjustment by the railroad community of its own industrial controversies. . . . The assumption as well as the aim of that Act [of 1934] is a process of permanent conference and negotiation between the carriers on the one hand and the employees through their unions on the other." *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 752–753 (dissenting opinion).

Performance of these functions entails the expenditure of considerable funds. Moreover, this Court has

held that under the statutory scheme, a union's status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion. *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210. The principal argument made by the unions in 1950 was based on their role in this regulatory framework. They maintained that because of the expense of performing their duties in the congressional scheme, fairness justified the spreading of the costs to all employees who benefited. They thus advanced as their purpose the elimination of the "free riders"—those employees who obtained the benefits of the unions' participation in the machinery of the Act without financially supporting the unions.

George M. Harrison, spokesman for the Railway Labor Executives' Association, stated the unions' case in this fashion:

> "Activities of labor organizations resulting in the procurement of employee benefits are costly, and the only source of funds with which to carry on these activities is the dues received from members of the organization. We believe that it is essentially unfair for nonmembers to participate in the benefits of those activities without contributing anything to the cost. This is especially true when the collective bargaining representative is one from whose existence and activities he derives most important benefits and one which is obligated by law to extend these advantages to him.
>
> "Furthermore, collective bargaining to the railroad industry is more costly from a monetary standpoint than that carried on in any other industry. The administrative machinery is more complete and more complex. The mediation, arbitration, and Presidential Emergency Board provisions of the act, while greatly in the public interest, are very costly to the

unions. The handling of agreement disputes through the National Railroad Adjustment Board also requires expense which is not known to unions in outside industry." Hearings on H. R. 7789, House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., p. 10.

This argument was decisive with Congress. The House Committee Report traced the history of previous legislation in the industry and pointed out the duty of the union acting as exclusive bargaining representative to represent equally all members of the class. "Under the act, the collective-bargaining representative is required to represent the entire membership of the craft or class, including nonunion members, fairly, equitably, and in good faith. Benefits resulting from collective bargaining may not be withheld from employees because they are not members of the union." H. R. Rep. No. 2811, 81st Cong., 2d Sess., p. 4. Observing that about 75% or 80% of all railroad employees were believed to belong to a union, the report continued: "Nonunion members, nevertheless, share in the benefits derived from collective agreements negotiated by the railway labor unions but bear no share of the cost of obtaining such benefits." *Ibid.*[13]

[13] For reiteration by various union spokesmen of this purpose of eliminating the problems created by the "free rider," see Hearings on S. 3295, *supra,* pp. 6, 32–33, 36, 40, 66, 130, 236–237; Hearings on H. R. 7789, *supra,* pp. 9, 19, 25–26, 29, 37–38, 49–50, 79, 81, 85, 87, 89, 228, 240–241, 250, 253, 255, 275. For other statements by members of Congress indicating their acceptance of this justification for the legislation, see Senate Hearings, *supra,* pp. 169–171; House Hearings, *supra,* pp. 25, 87, 106, 110, 139; 96 Cong. Rec. 16279, 17050–17051, 17055, 17057, 17058.

Mr. Harrison expressly disclaimed that the union shop was sought in order to strengthen the bargaining power of the unions. He said:

"I do not think it would affect the power of bargaining one way or the other . . . . If I get a majority of the employees to vote for my union as the bargaining agent, I have got as much economic

These considerations overbore the arguments in favor of the earlier policy of complete individual freedom of. choice. As we said in *Railway Employes' Dept. v. Hanson, supra,* p. 235, "[t]o require, rather than to induce, the beneficiaries of trade unionism to contribute to its costs may not be the wisest course. But Congress might well believe that it would help insure the right to work in and along the arteries of interstate commerce. No more has been attempted here. . . . The financial support required relates . . . to the work of the union in the realm of collective bargaining." [14] The conclusion to which this history clearly

power at that stage of development as I will ever have. The man that is going to scab—he will scab whether he is in or out of the union, and it does not make any difference." House Hearings, *supra,* pp. 20–21.

Nor was any claim seriously advanced that the union shop was necessary to hold or increase union membership. The prohibition against union security in the 1934 Act had not interfered with the growth of union membership or caused the unions to lose their positions as exclusive bargaining agents. See *A. F. of L.* v. *American Sash Co.,* 335 U. S. 538, 548–549, n. 4 (concurring opinion); see also Transcript of Proceedings, Presidential Emergency Board No. 98, appointed pursuant to Exec. Order No. 10306, Nov. 15, 1951, Carriers' Exhibits W–23, W–28, pp. 38–51.

[14] The unions continued to urge the elimination of the problems created by the "free rider" as the justification for the union shop in the proceedings before the Presidential Emergency Board, which recommended that the carriers make the agreements involved in this case. Mr. Harrison said: ". . . the railroad unions' primary purpose in seeking and obtaining the amendment to the Railway Labor Act in 1951 to permit the check-off for payment of dues, was to eliminate the 'free rider,' the guy who drags his feet, a term which is applied by unions to non-members who obtain, without cost to themselves, the benefits of collective bargaining procured through the efforts of the dues-paying members." Transcript of Proceedings, Presidential Emergency Board No. 98, appointed pursuant to Exec. Order No. 10306, Nov. 15, 1951, p. 150. See also Transcript, pp. 40–44, 144–156, 182–183, 186–188, 202–203, 268, 283–286, 289, 545,

points is that § 2, Eleventh contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes.[15]   One looks in vain for any suggestion that Congress also meant in § 2, Eleventh to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose.

---

608–611, 1893, 1901, 2136, 2495–2497, 2795, 2839, 2930, 3014–3015, 3018–3019.

[15] Section 2, Eleventh (c), which gives scope for intercraft mobility in the rail industry, is consistent with the view that the primary union and congressional concern was with the elimination of the "free rider" who did not support his representative's performance of its functions under the Act.   The section provides that an operating employee cannot be required to become a member of his craft or class representative if "said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services . . . ."   This Court held in *Pennsylvania R. Co.* v. *Rychlik,* 352 U. S. 480, that the unions "national in scope" contemplated by this provision are those which have already qualified as electors under § 3 of the Act to participate in the National Railroad Adjustment Board.   As the court said in *Pigott* v. *Detroit, T. & I. R. Co.,* 116 F. Supp. 949, 955, n. 11, aff'd, 221 F. 2d 736: "Each union participating in the agencies of the Act must itself pay for the salaries and expenses of its officials who serve in such agencies.   This constitutes a considerable financial burden which must be reflected in the dues charged the employees.   Unless a labor organization were obliged to participate in the judgment board machinery before it could qualify for the union shop exception, it would place the bargaining representative in an unfair competitive position with respect to a rival union.   Employees would be tempted to desert the organization of a bargaining representative which was assuming its responsibilities under the Act in favor of another union which was not contributing to its operation and which could thereby offer cheaper dues.   This would defeat the very purpose of the union amendment which is to compel each employee to contribute his part to the bargaining representative's activities on his behalf, including its participation in the administrative machinery of the Act."

## III.

### THE SAFEGUARDING OF RIGHTS OF DISSENT.

To the contrary, Congress incorporated safeguards in the statute to protect dissenters' interests. Congress became concerned during the hearings and debates that the union shop might be used to abridge freedom of speech and beliefs. The original proposal for authorization of the union shop was qualified in only one respect. It provided "That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member . . . ." This was primarily designed to prevent discharge of employees for nonmembership where the union did not admit the employee to membership on racial grounds. See House Hearings, p. 68; Senate Hearings, pp. 22–25. But it was strenuously protested that the proposal provided no protection for an employee who disagreed with union policies or leadership. It was argued, for example, that "the right of free speech is at stake. . . . A man could feel that he was no longer able freely to express himself because he could be dismissed on account of criticism of the union . . . ." House Hearings, p. 115; see also Senate Hearings, pp. 167–169, 320. Objections of this kind led the rail unions to propose an addition to the proviso to § 2, Eleventh to prevent loss of job for lack of union membership "with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, fees, and assessments uniformly required as a condition of acquiring or retaining membership." House Hearings, p. 247. Mr. Harrison presented this text and stated, "It is submitted that this bill with the amendment as suggested in this state-

ment remedies the alleged abuses of compulsory union membership as claimed by the opposing witnesses, yet makes possible the elimination of the 'free rider' and the sharing of the burden of maintenance by all of the beneficiaries of union activity." House Hearings, p. 253. Mr. Harrison also sought to reassure Committee members as to the possible implications of other language of the proposed bill; he explained that "fees" meant "initiation fees," and "assessments" was intended primarily to cover the situation of a union which had only nominal dues, so that its members paid "an assessment to finance the activities of the general negotiating committee . . . it will vary month by month, based on the expenses and work of that committee." P. 257. Or, he explained, an assessment might cover convention expenses. "So we had to use the word 'assessment' in addition to dues and fees because some of the unions collect a nominal amount of dues and an assessment month after month to finance part of the activities, although in total it perhaps is no different than the dues paid in the first instance which comprehended all of those expenses." P. 258. In reporting the bill, the Senate Committee expressly noted the protective proviso, S. Rep. No. 2262, 81st Cong., 2d Sess., pp. 3–4, and affixed the Senate additional limitations. The words "not including fines and penalties" were added, to make it clear that termination of union membership for their nonpayment would not be grounds for discharge. It was also made explicit that "fees" meant "initiation fees." See 96 Cong. Rec. 16267–16268.

A congressional concern over possible impingements on the interests of individual dissenters from union policies is therefore discernible. It is true that opponents of the union shop urged that Congress should not allow it without explicitly regulating the amount of dues which might be exacted or prescribing the uses for

which the dues might be expended.[16]  We may assume that Congress was also fully conversant with the long history of intensive involvement of the railroad unions in political activities.  But it does not follow that § 2, Eleventh places no restriction on the use of an employee's money, over his objection, to support political causes he opposes merely because Congress did not enact a comprehensive regulatory scheme governing expenditures.  For it is abundantly clear that Congress did not completely abandon the policy of full freedom of choice embodied in the 1934 Act, but rather made inroads on it for the limited purpose of eliminating the problems created by the "free rider."  That policy survives in § 2, Eleventh in the safeguards intended to protect freedom of dissent.  Congress was aware of the conflicting interests involved in the question of the union shop and sought to achieve their accommodation.  As was said by the Presidential Emergency Board which recommended the making of the union-shop agreement involved in this case:

> "It is not as though Congress had believed it was merely removing some abstract legal barrier and not passing on the merits.  It was made fully aware that it was deciding these critical issues of individual right versus collective interests which have been stressed in this proceeding.
>
> "Indeed, Congress gave very concrete evidence that it carefully considered the claims of the individual to be free of arbitrary or unreasonable restrictions resulting from compulsory unionism.  It did not give a blanket approval to union-shop agreements.  Instead it enacted a precise and carefully

---

[16] See Senate Hearings, pp. 173–174, 316–317; House Hearings, pp. 160, 172–173.  See also 96 Cong. Rec. 17049–17050.

drawn limitation on the kind of union-shop agreements which might be made. The obvious purpose of this careful prescription was to strike a balance between the interests pressed by the unions and the considerations which the Carriers have urged. By providing that a worker should not be discharged if he was denied or if he lost his union membership for any reason other than nonpayment of dues, initiation fees or assessments, Congress definitely indicated that it had weighed carefully and given effect to the policy of the arguments against the union shop." Report of Presidential Emergency Board No. 98, appointed pursuant to Exec. Order No. 10306, Nov. 15, 1951, p. 6.

We respect this congressional purpose when we construe § 2, Eleventh as not vesting the unions with unlimited power to spend exacted money. We are not called upon to delineate the precise limits of that power in this case. We have before us only the question whether the power is restricted to the extent of denying the unions the right, over the employee's objection, to use his money to support political causes which he opposes. Its use to support candidates for public office, and advance political programs, is not a use which helps defray the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes. In other words, it is a use which falls clearly outside the reasons advanced by the unions and accepted by Congress why authority to make union-shop agreements was justified. On the other hand, it is equally clear that it is a use to support activities within the area of dissenters' interests which Congress enacted the proviso to protect. We give § 2, Eleventh the construction which achieves both congressional purposes when we hold, as we do, that § 2, Eleventh is to be construed to deny the unions, over an

employee's objection, the power to use his exacted funds to support political causes which he opposes.[17]

We express no view as to other union expenditures objected to by an employee and not made to meet the costs of negotiation and administration of collective agreements, or the adjustment and settlement of grievances and disputes. We do not understand, in view of the findings of the Georgia courts and the question decided by the Georgia Supreme Court, that there is before us the matter of expenditures for activities in the area between the costs which led directly to the complaint as to "free riders," and the expenditures to support

---

[17] A distinction between the use of union funds for political purposes and their expenditure for nonpolitical purposes is implicit in other congressional enactments. Thus the Treasury has adopted this regulation under § 162 of the Internal Revenue Code of 1954 to govern the deductibility for income-tax purposes of payments by union members to their union:

"Dues and other payments to an organization, such as a labor union or a trade association, which otherwise meet the requirements of the regulations under section 162, are deductible in full unless a substantial part of the organization's activities consists of [expenditures for lobbying purposes, for the promotion or defeat of legislation, for political campaign purposes (including the support of or opposition to any candidate for public office), or for carrying on propaganda (including advertising) related to any of the foregoing purposes] . . . . If a substantial part of the activities of the organization consists of one or more of those specified, deduction will be allowed only for such portion of such dues and other payments as the taxpayer can clearly establish is attributable to activities other than those so specified. The determination as to whether such specified activities constitute a substantial part of an organization's activities shall be based on all the facts and circumstances. In no event shall special assessments or similar payments (including an increase in dues) made to any organization for any of such specified purposes be deductible." 26 CFR § 1.162–15 (c)(2); see also Rev. Proc. 61–10, 1961–16 Int. Rev. Bull. 49, April 17, 1961. Cf. *Cammarano* v. *United States*, 358 U. S. 498.

union political activities.[18]   We are satisfied, however, that § 2, Eleventh is to be interpreted to deny the unions the power claimed in this case.   The appellant unions, in insisting that § 2, Eleventh contemplates their use of exacted funds to support political causes objected to by the employee, would have us hold that Congress sanctioned an expansion of historical practices in the political area by the rail unions.   This we decline to do.   Both by tradition and, from 1934 to 1951, by force of law, the rail unions did not rely upon the compulsion of union security agreements to exact money to support the political activities in which they engage.   Our construction therefore involves no curtailment of the traditional political activities of the railroad unions.   It means only that those unions must not support those activities, against the expressed wishes of a dissenting employee, with his exacted money.[19]

[18] For example, many of the national labor unions maintain death benefit funds from the dues of individual members transmitted by the locals.

[19] In 1958 Senator Potter proposed an amendment to pending labor legislation that would have given employees subject to a union-shop agreement the right to have their dues used only for collective bargaining and related purposes and would have required the Secretary of Labor, if he determined that the dues were not so expended, to bring an action in behalf of the dissenter for the recovery of all the money paid by the dissenter to the union during the life of the agreement and for such other appropriate and injunctive relief as the court deemed just and proper.   See 104 Cong. Rec. 11330.   Senator Potter advanced this proposal to implement principles which he believed to be already implicit in the labor laws.   He said, "I know that when Congress enacted legislation providing for labor and management to enter into contracts for union shops it was intended, under the union shop principle, that labor would use the dues for collective-bargaining purposes."   104 Cong. Rec. 11215; see also *id.*, p. 11331.   The failure of the amendment to be adopted reflected disagreement in the Senate over the scope of its coverage and doubts as to the propriety of the breadth of the remedy.   See 104 Cong. Rec. 11214–11224, 11330–11347.

## IV.

### The Appropriate Remedy.

Under our view of the statute, however, the decision of the court below was erroneous and cannot stand. The appellees who have participated in this action have in the course of it made known to their respective unions their objection to the use of their money for the support of political causes. In that circumstance, the respective unions were without power to use payments thereafter tendered by them for such political causes. However, the union-shop agreement itself is not unlawful. *Railway Employes' Dept.* v. *Hanson, supra.* The appellees therefore remain obliged, as a condition of continued employment, to make the payments to their respective unions called for by the agreement. Their right of action stems not from constitutional limitations on Congress' power to authorize the union shop, but from § 2, Eleventh itself. In other words, appellees' grievance stems from the spending of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union-shop agreement by the mere collection of funds. If their money were used for purposes contemplated by § 2, Eleventh, the appellees would have no grievance at all. We think that an injunction restraining enforcement of the union-shop agreement is therefore plainly not a remedy appropriate to the violation of the Act's restriction on expenditures. Restraining the collection of all funds from the appellees sweeps too broadly, since their objection is only to the uses to which some of their money is put. Moreover, restraining collection of the funds as the Georgia courts have done might well interfere with the appellant unions' performance of those functions and duties which the Railway Labor Act places upon them to attain its goal of stability in the industry. Even though the lower court decree is subject to modifi-

cation upon proof by the appellants of cessation of improper expenditures, in the interim the prohibition is absolute against the collection of all funds from anyone who can show that he is opposed to the expenditure of any of his money for political purposes which he disapproves. The complete shutoff of this source of income defeats the congressional plan to have all employees benefited share costs "in the realm of collective bargaining," *Hanson,* 351 U. S., at p. 235, and threatens the basic congressional policy of the Railway Labor Act for self-adjustments between effective carrier organizations and effective labor organizations.[20]

Since the case must therefore be remanded to the court below for consideration of a proper remedy, we think that it is appropriate to suggest the limits within which remedial discretion may be exercised consistently with the Railway Labor Act and other relevant public policies. As indicated, an injunction against enforcement of the union shop itself through the collection of funds is unwarranted. We also think that a blanket injunction against all expenditures of funds for the disputed purposes, even one conditioned on cessation of improper expenditures, would not be a proper exercise of equitable discretion. Nor would it be proper to issue an interim or temporary blanket injunction of this character pending a final adjudication. The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–115, expresses a basic policy against the injunction of activities of labor unions. We have held that the Act does not deprive the federal courts of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *Graham* v. *Brotherhood of Locomotive*

---

[20] Compare Senator Kennedy's objection to the remedy for recovery of all dues contemplated by the Potter amendment. 104 Cong. Rec. 11346.

*Firemen & Enginemen,* 338 U. S. 232. However, the policy of the Act suggests that the courts should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor laws unless that remedy alone can effectively guard the plaintiff's right. In *Graham* this Court found an injunction necessary to prevent the breach of the duty of fair representation, in order that Congress might not seem to have held out to the petitioners there "an illusory right for which it was denying them a remedy." 338 U. S., at p. 240. No such necessity for a blanket injunctive remedy because of the absence of reasonable alternatives appears here. Moreover, the fact that these expenditures are made for political activities is an additional reason for reluctance to impose such an injunctive remedy. Whatever may be the powers of Congress or the States to forbid unions altogether to make various types of political expenditures, as to which we express no opinion here,[21] many of the expenditures involved in the present case are made for the purpose of disseminating information as to candidates and programs and publicizing the positions of the unions on them. As to such expenditures an injunction would work a restraint on the expression of political ideas which might be offensive to the First Amendment. For the majority also has an interest in stating its views without being silenced by the dissenters. To attain the appropriate reconciliation between majority and dissenting interests in the area of political expression, we think the courts in administering the Act should select remedies which protect both interests to the maximum extent possible without undue impingement of one on the other.

---

[21] No contention was made below or here that any of the expenditures involved in this case were made in violation of the Federal Corrupt Practices Act, 18 U. S. C. § 610, or any state corrupt practices legislation.

Among possible remedies which would appear appropriate to the injury complained of, two may be enforced with a minimum of administrative difficulty [22] and with little danger of encroachment on the legitimate activities or necessary functions of the unions. Any remedies, however, would properly be granted only to employees who have made known to the union officials that they do not desire their funds to be used for political causes to which they object. The safeguards of § 2, Eleventh were added for the protection of dissenters' interest, but dissent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee. The union receiving money exacted from an employee under a union-shop agreement should not in fairness be subjected to sanctions in favor of an employee who makes no complaint of the use of his money for such activities. From these considerations, it follows that the present action is not a true class action, for there is no attempt to prove the existence of a class of workers who had specifically objected to the exaction of dues for political purposes. See *Hansberry* v. *Lee,* 311 U. S. 32, 44. Thus we think that only those who have identified themselves as opposed to political uses of their funds are entitled to relief in this action.

One remedy would be an injunction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the

[22] We note that the Labor-Management Reporting and Disclosure Act of 1959 requires every labor organization subject to the federal labor laws to file annually with the Secretary of Labor a financial report as to certain specified disbursements and also "other disbursements made by it including the purposes thereof . . . ." § 201 (b) (6). Each union is also required to maintain records in sufficient detail to supply the necessary basic information and data from which the report may be verified. § 206. The information required to be contained in such report must be available to all union members. § 201 (c).

union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget. The union should not be in a position to make up such sum from money paid by a nondissenter, for this would shift a disproportionate share of the costs of collective bargaining to the dissenter and have the same effect of applying his money to support such political activities. A second remedy would be restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed. There should be no necessity, however, for the employee to trace his money up to and including its expenditure; if the money goes into general funds and no separate accounts of receipts and expenditures of the funds of individual employees are maintained, the portion of his money the employee would be entitled to recover would be in the same proportion that the expenditures for political purposes which he had advised the union he disapproved bore to the total union budget.

The judgment is reversed and the case is remanded to the court below for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Douglas, concurring.

Some forced associations are inevitable in an industrial society. One who of necessity rides busses and street cars does not have the freedom that John Muir and Walt Whitman extolled. The very existence of a factory brings into being human colonies. Public housing in some areas may of necessity take the form of apartment buildings which to some may be as repulsive as ant hills. Yet people in teeming communities often have no other choice.

Legislatures have some leeway in dealing with the problems created by these modern phenomena.

Collective bargaining is a remedy for some of the problems created by modern factory conditions. The beneficiaries are all the members of the laboring force. We therefore concluded in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, that it was permissible for the legislature to require all who gain from collective bargaining to contribute to its cost.[1] That is the narrow and precise holding of the *Hanson* case, as MR. JUSTICE BLACK shows.

Once an association with others is compelled by the facts of life, special safeguards are necessary lest the spirit of the First, Fourth, and Fifth Amendments be lost and we all succumb to regimentation. I expressed this concern in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467 (dissenting opinion), where a "captive audience" was forced to listen to special radio broadcasts. If an association is compelled, the individual should not be forced to surrender any matters of conscience, belief, or expression. He should be allowed to enter the group with his own flag flying, whether it be religious, political, or philosophical; nothing that the group does should deprive him of the privilege of preserving and expressing his agreement, disagreement, or dissent, whether it coincides with the view of the group, or conflicts with it in minor or major ways; and he should not be required to finance the promotion of causes with which he disagrees.

In a debate on the Universal Declaration of Human Rights, later adopted by the General Assembly of the United Nations on December 10, 1948, Mr. Malik of

---

[1] The problem of employees who receive benefits of union representation but who are unwilling to give financial support to the union has received much attention from Congress (see S. Rep. No. 105, 80th Cong., 1st Sess., pp. 5–7; H. R. Rep. No. 510, 80th Cong., 1st Sess., pp. 42–43) and from the courts. See *Radio Officers* v. *Labor Board,* 347 U. S. 17.

Lebanon stated what I think is the controlling principle in cases of the character now before us:

"The social group to which the individual belongs, may, like the human person himself, be wrong or right: the person alone is the judge." [2]

This means that membership in a group cannot be conditioned on the individual's acceptance of the group's philosophy.[3] Otherwise, First Amendment rights are required to be exchanged for the group's attitude, philosophy, or politics. I do not see how that is permissible under the Constitution. Since neither Congress nor the state legislatures can abridge those rights, they cannot grant the power to private groups to abridge them. As I read the First Amendment, it forbids any abridgment by government whether directly or indirectly.

The collection of dues for paying the costs of collective bargaining of which each member is a beneficiary is one thing. If, however, dues are used, or assessments are made, to promote or oppose birth control, to repeal or increase the taxes on cosmetics, to promote or oppose the admission of Red China into the United Nations, and the like, then the group compels an individual to support with his money causes beyond what gave rise to the need for group action.

---

[2] Commission on Human Rights, Summary Record of the Fourteenth Meeting, February 4, 1947, U. N. Doc. E/CN.4/SR.14, p. 4.

[3] We noted in the *Hanson* case, 351 U. S. 236–237, n. 8, various restrictions placed by union constitutions and by-laws on individual members. Some disqualified persons from membership for their political views or associations. Certainly government could not prescribe standards of that character.

Some restrained members from certain kinds of speech or activity. Certainly government could not impose these restraints.

Some required the use of portions of union funds for purposes other than collective bargaining. Plainly those conditions could not be imposed by the state or federal government or enforced by the judicial branch of government. See *Shelley* v. *Kraemer*, 334 U. S. 1; *Barrows* v. *Jackson*, 346 U. S. 249.

I think the same must be said when union dues or assessments are used to elect a Governor, a Congressman, a Senator, or a President. It may be said that the election of a Franklin D. Roosevelt rather than a Calvin Coolidge might be the best possible way to serve the cause of collective bargaining. But even such a selective use of union funds for political purposes subordinates the individual's First Amendment rights to the views of the majority. I do not see how that can be done, even though the objector retains his rights to campaign, to speak, to vote as he chooses. For when union funds are used for that purpose, the individual is required to finance political projects against which he may be in rebellion.[4] The furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy. If that were allowed, we would be reversing the *Hanson* case, *sub silentio*. But since the funds here in issue are used for causes other than defraying the costs of collective bargaining, I would affirm the judgment below with modifications. Although I recognize the strength of the arguments advanced by my Brothers BLACK and WHITTAKER against giving a "proportional" relief to appellees in this case, there is the practical prob-

---

[4] Hostility to such compulsion was expressed early in our history. Madison, in his Memorial and Remonstrance Against Religious Assessments, wrote, "Who does not see . . . that the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" II Writings of James Madison (Hunt ed. 1901), p. 186.

Jefferson in his 1779 Bill for Religious Liberty wrote "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves is sinful and tyrannical." See 12 Hening's Va. Stat. 85; Brant, Madison, The Nationalist (1948), p. 354.

lem of mustering five Justices for a judgment in this case. Cf. *Screws* v. *United States,* 325 U. S. 91, 134. So I have concluded *dubitante* to agree to the one suggested by MR. JUSTICE BRENNAN, on the understanding that all relief granted will be confined to the six protesting employees. This suit, though called a "class" action, does not meet the requirements as the use or nonuse of any dues or assessments depends on the choice of each individual, not the group. See *Hansberry* v. *Lee,* 311 U. S. 32, 44.

MR. JUSTICE WHITTAKER, concurring in part and dissenting in part.

Understanding the Court's opinion to hold—put in my own words—that, in enacting § 2, Eleventh of the Railway Labor Act, Congress intended to, and impliedly did, limit the use that railway labor unions may make of dues, fees and assessments, collected from those of its members who were or are required to become or remain its members by force of union shop contracts negotiated as permitted by that section, only to defray the costs of negotiating and administering collective bargaining agreements—including the adjustment and settlement of disputes—and that the *Hanson* case, rightly construed, upholds no more than that, I join Points I, II and III of the Court's opinion.

But I dissent from Point IV of the Court's opinion. In respect to that point, it seems appropriate to make the following observations. When many members pay the same amount of monthly dues into the treasury of the union which dispenses the fund for what are, under the Court's opinion, both permitted and proscribed activities, how can it be told whose dues paid for what? Let us suppose a union with two members, each paying monthly dues of three dollars, and that one does but the other does not object to his dues being expended for "proscribed

activity"—whatever that phrase may mean. Of the dues for a given month, the union expends four dollars for admittedly proper activity and two dollars for "proscribed activity," answering to the objector that the two dollars spent for "proscribed activity" were not from his, but from the other's, dues. Would not the result be that the objector was thus required to pay not his one-half but three-fourths of the union's legitimate expenses? Or, has not the objector nevertheless paid a ratable part of the cost of the "proscribed activity"?

The Court suggests that a proper decree might require "restitution" to the objector of that part of his dues that is equal to the ratio of dues spent for "proscribed activity" to total dues collected by the union. But even if the Court could draw a clear line between what is and what is not "proscribed activity," the accounting and proof problems involved would make the remedy most onerous and impractical. But when there is added to this a full recognition of the practical impossibility of judicially drawing the clear line mentioned and also of the fact that the local unions which collect the dues promptly pay a part of them to the national union which, in turn, also engages in "proscribed activity," it becomes plain that the suggested restitution remedy is impossible of practical performance.

It would seem to follow that the only practical remedy possible is the one formulated by the Georgia courts, and I would approve it.

Mr. Justice Black, dissenting.

This action was brought in a Georgia state court by six railroad employees [1] in behalf of themselves "and others similarly situated" against railroads making up the

---

[1] Although there were more complainants when the suit was brought, there were only six when the trial was completed.

Southern Railway System, labor organizations representing employees of that system in collective bargaining, and a number of individuals, to enjoin enforcement and application to them of a union-shop agreement entered into between the railroads and the labor organizations as authorized by § 2, Eleventh of the Railway Labor Act.[2] The agreement's terms required all employees, in order to keep their railroad jobs, to join the union and remain members, at least to the extent of tendering periodic dues, initiation fees and assessments, not including fines and penalties.[3]   The complaint, as amended, charged that the agreement was void because it conflicted with the laws and Constitution of Georgia and the First, Fifth, Ninth and Fourteenth Amendments to the Federal Constitution. Section 2, Eleventh provides that such union shops are valid "[n]otwithstanding any other . . . statute or law of the United States . . . or of any State."  Relying on our decision in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, which upheld contracts made pursuant to that section, the Georgia trial court dismissed the complaint as amended.  The State Supreme Court reversed and remanded the case for trial, distinguishing our *Hanson* decision as follows:

> "It is alleged that the union dues and other payments they will be required to make to the union

---

[2] 64 Stat. 1238, 45 U. S. C. § 152, Eleventh.

[3] In accordance with the requirements of the statute, the agreement provided, in language almost identical to that of the statute, that no employee would be required to become or remain a member of the union "if such membership is not available to such employe upon the same terms and conditions as are generally applicable to any other member, or if the membership of such employe is denied or terminated for any reason other than the failure of the employe to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

will be used to 'support ideological and political doc-
trines and candidates' which they are unwilling to
support and in which they do not believe, and that
this will violate the First, Fifth and Ninth Amend-
ments of the Constitution. While Railway Emp.
Dept. *v.* Hanson, 351 U. S. 225, supra, upheld the
validity of a closed shop contract executed under § 2,
Eleventh, that opinion clearly indicates that that
court would not approve a requirement that one join
the union if his contributions thereto were used as
this petition alleges. It is there said (headnote 3c):
'Judgment is *reserved* [italics in Georgia Supreme
Court opinion] as to the validity or enforceability
of a union or closed shop agreement if other condi-
tions of union membership are imposed or if the
exaction of dues, initiation fees or assessments is used
as a cover for forcing ideological conformity or other
action in contravention of the First or the Fifth
Amendment.' We must render judgment now upon
this precise question. We do not believe one can
constitutionally be compelled to contribute money
to support ideas, politics and candidates which he
opposes. . . ." [4]

On remand, testimony, admissions and stipulations
showed without dispute that union funds collected from
dues, fees and assessments were regularly used to support
and oppose various political and economic programs,
candidates, parties and ideological causes, and that the
complaining employees were opposed to many of the posi-
tions the unions took in these matters. The trial court
made lengthy findings, one crucial here being:

"Those funds have been and are being used in
substantial amounts to propagate political and

---

[4] *Looper* v. *Georgia Southern & F. R. Co.*, 213 Ga. 279, 284, 99
S. E. 2d 101, 104–105.

economic doctrines, concepts and ideologies and to promote legislative programs opposed by plaintiffs and the class they represent."

The trial court then found and declared § 2, Eleventh "unconstitutional to the extent that it permits, or is applied to permit, the exaction of funds from plaintiffs and the class they represent for the complained of purposes and activities set forth above." Compulsory membership under these circumstances was held to abridge First Amendment freedoms of association, thought, speech, press and political expression.[5] On the basis of this holding the trial court enjoined all the defendants "from enforcing the said union shop agreements . . . and from discharging petitioners, or any member of the class they represent, for refusing to become or remain members of, or pay periodic dues, fees, or assessments to, any of the labor union defendants, provided, however, that said defendants may at any time petition the court to dissolve said injunction upon a showing that they no longer are engaging in the improper and unlawful activities described above." Again, the activities referred to were the use of union funds collected from fees, dues and assessments to support candidates, parties, or ideological, economic or political views contrary to the wishes of the complaining employees. The trial court also decreed that the three employees who had been compelled under protest to pay dues, fees and assessments because of the union-shop agreement were entitled to have those payments returned.

The Supreme Court of Georgia affirmed, holding that "[o]ne who is compelled to contribute the fruits of his

---

[5] The trial court also held that the section as enforced violated the Fifth, Ninth and Tenth Amendments. My view as to the First Amendment makes it unnecessary for me to consider the claims under the other Amendments.

labor to support or promote political or economic programs or support candidates for public office is just as much deprived of his freedom of speech as if he were compelled to give his vocal support to doctrines he opposes." [6]   I fully agree with this holding of the Georgia Supreme Court and would affirm its judgment with certain modifications of the relief granted.

## I.

Section 2, Eleventh of the Railway Labor Act authorizes unions and railroads to make union-shop agreements notwithstanding any other provision of state or federal law.   Such a contract simply means that no person can keep a job with the contracting railroad unless he becomes a member of and pays dues to the contracting union. Neither § 2, Eleventh nor any other part of the Act contains any implication or even a hint that Congress wanted to limit the purposes for which a contracting union's dues should or could be spent.   All the parties to this litigation have agreed from its beginning, and still agree, that there is no such limitation in the Act.   The Court nevertheless, in order to avoid constitutional questions, interprets the Act itself as barring use of dues for political purposes.   In doing this I think the Court is once more "carrying the doctrine of avoiding constitutional questions to a wholly unjustifiable extreme." [7]   In fact, I think the Court is actually rewriting § 2, Eleventh to make it mean exactly what Congress refused to make it mean.   The very legislative history relied on by the Court appears to me to prove that its interpretation of § 2, Eleventh is without justification.   For that history shows that Congress with its eyes wide open passed that section, knowing that its broad language would permit the use of union dues

---

[6] 215 Ga. 27, 46, 108 S. E. 2d 796, 808.

[7] *Clay* v. *Sun Insurance Office,* 363 U. S. 207, 213 (dissenting opinion).

to advocate causes, doctrines, laws, candidates and parties, whether individual members objected or not.[8] Under such circumstances I think Congress has a right to a determination of the constitutionality of the statute it passed, rather than to have the Court rewrite the statute in the name of avoiding decision of constitutional questions.

The end result of what the Court is doing is to distort this statute so as to deprive unions of rights I think Congress tried to give them and at the same time, in the companion case of *Lathrop* v. *Donohue,* decided today, *post,* p. 820, leave itself free later to hold that integrated bar associations can constitutionally exercise the powers now denied to labor unions for fear of unconstitutionality. The constitutional question raised alike in this case and in *Lathrop* is bound to come back here soon with a record so meticulously perfect that the Court cannot escape deciding it. Should the Court then hold that lawyers and workers can constitutionally be compelled to pay for the support of views they are against, the result would be that the labor unions would have lost their case this

---

[8] The specific problem of use of the compelled dues for political purposes was raised during both the hearings and the floor debates. Hearings on S. 3295, Subcommittee of the Senate Committee on Labor and Public Welfare, 81st Cong., 2d Sess., pp. 316–317; Hearings on H. R. 7789, House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., p. 160; 96 Cong. Rec. 17049–17050.

Again, in 1958, when Senator Potter introduced his amendment to limit the use of compelled dues to collective bargaining and related purposes, he pointed out on the floor of the Senate that "the fact is that under current practices in some of our labor organizations, dissenters are being denied the freedom not to support financially political or ideological or other activities which they may oppose." 104 Cong. Rec. 11214. It could hardly be contended that the debate on his proposal, which was defeated, indicated any generally held belief that such use of compelled dues was already proscribed under § 2, Eleventh or any other existing statute. See 104 Cong. Rec. 11214–11224, 11330–11347.

year on a statutory-constitutional basis while the integrated bar would win its case next year or the year after on the ground that the constitutional part of the basis for the holding against the unions today was groundless. Yet no one has suggested that the Court's statutory construction of § 2, Eleventh could possibly be supported without the crutch of its fear of unconstitutionality. This is why I think the Court's avoidance of the constitutional issue in both cases today is wholly unfair to the unions as well as to Congress. I must consider this case on the basis of my belief as to the constitutionality of § 2, Eleventh, interpreted so as to authorize compulsion of workers to pay dues to a union for use in advocating causes and political candidates that the protesting workers are against.

## II.

It is contended by the unions that precisely the same First Amendment question presented here was considered and decided in *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225. I agree that it clearly was not. Section 2, Eleventh was challenged there before it became effective and the main grounds of attack, as our opinion noted, were that the union-shop agreement would deprive employees of their freedom of association under the First Amendment and of their property rights under the Fifth. There were not in the *Hanson* case, as there are here, allegations, proof and findings that union funds regularly were being used to support political parties, candidates and economic and ideological causes to which the complaining employees were hostile. Our opinion in *Hanson* carefully pointed to the fact that only general "[w]ide-ranged problems" were tendered under the First Amendment and that imposition of "assessments . . . not germane to collective bargaining" would present "a different problem." The Court went on further to emphasize

that if at another time "the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. . . . We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments." [9]

Thus the *Hanson* case held only that workers could be required to pay their part of the cost of actual bargaining carried on by a union selected as bargaining agent under authority of Congress, just as Congress doubtless could have required workers to pay the cost of such bargaining had it chosen to have the bargaining carried on by the Secretary of Labor or any other appropriately selected bargaining agent. The *Hanson* case did not hold that railroad workers could be compelled by law to forego their constitutionally protected freedom of association by participating as union "members" against their will. That case cannot, therefore, properly be read to rest on a principle which would permit government—in furtherance of some public interest, be that interest actual or imaginary—to compel membership in Rotary Clubs, fraternal organizations, religious groups, chambers of commerce, bar associations, labor unions, or any other private organizations Government may decide it wants to subsidize, support or control. In a word, the *Hanson* case did not hold that the existence of union-shop contracts could be used as an excuse to force workers to associate with people they do not want to associate with, or to pay their money to support causes they detest.

---

[9] 351 U. S., at 235, 236, 238. See also *id.*, at 242 (concurring opinion).

## III.

The First Amendment provides:

> "Congress shall make no law respecting an estab-
> lishment of religion, or prohibiting the free exercise
> thereof; or abridging the freedom of speech, or of
> the press; or the right of the people peaceably to
> assemble, and to petition the Government for a
> redress of grievances."

Probably no one would suggest that Congress could, with-
out violating this Amendment, pass a law taxing workers,
or any persons for that matter (even lawyers), to create a
fund to be used in helping certain political parties or
groups favored by the Government to elect their candi-
dates or promote their controversial causes. Compelling
a man by law to pay his money to elect candidates or
advocate laws or doctrines he is against differs only in
degree, if at all, from compelling him by law to speak for
a candidate, a party, or a cause he is against. The very
reason for the First Amendment is to make the people of
this country free to think, speak, write and worship as
they wish, not as the Government commands.

There is, of course, no constitutional reason why a
union or other private group may not spend its funds for
political or ideological causes if its members voluntarily
join it and can voluntarily get out of it.[10] Labor unions
made up of voluntary members free to get in or out of
the unions when they please have played important and
useful roles in politics and economic affairs.[11] How to
spend its money is a question for each voluntary group
to decide for itself in the absence of some valid law for-

---

[10] See *DeMille* v. *American Federation of Radio Artists*, 175 P. 2d
851, 854 (Cal. Dist. Ct. App.), aff'd, 31 Cal. 2d 139, 147–149, 187
P. 2d 769, 775–776, cert. denied, 333 U. S. 876.

[11] *United States* v. *C. I. O.*, 335 U. S. 106, 144 (concurring opinion).

bidding activities for which the money is spent.[12]   But a different situation arises when a federal law steps in and authorizes such a group to carry on activities at the expense of persons who do not choose to be members of the group as well as those who do.   Such a law, even though validly passed by Congress, cannot be used in a way that abridges the specifically defined freedoms of the First Amendment.   And whether there is such abridgment depends not only on how the law is written but also on how it works.[13]

There can be no doubt that the federally sanctioned union-shop contract here, as it actually works, takes a part of the earnings of some men and turns it over to others, who spend a substantial part of the funds so received in efforts to thwart the political, economic and ideological hopes of those whose money has been forced from them under authority of law.   This injects federal compulsion into the political and ideological processes, a result which I have supposed everyone would agree the First Amendment was particularly intended to prevent. And it makes no difference if, as is urged, political and legislative activities are helpful adjuncts of collective bargaining.   Doubtless employers could make the same

---

[12] See, *e. g., Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490.

[13] We held in the *Hanson* case, with respect to this very same § 2, Eleventh, that even though the statutory provision authorizing union shops is only permissive, that provision, "which expressly declares that state law is superseded," is "the source of the power and authority by which any private rights are lost or sacrificed" and therefore is "the governmental action on which the Constitution operates." 351 U. S., at 232.   Even though § 2, Eleventh is permissive in form, Congress was fully aware when enacting it that the almost certain result would be the establishment of union shops throughout the railroad industry.   Witness after witness so testified during the hearings on the bill, and this testimony was never seriously disputed.   See Hearings on S. 3295, *supra,* note 8, *passim;* Hearings on H. R. 7789, *supra,* note 8, *passim.*

arguments in favor of compulsory contributions to an association of employers for use in political and economic programs calculated to help collective bargaining on their side. But the argument is equally unappealing whoever makes it. The stark fact is that this Act of Congress is being used as a means to exact money from these employees to help get votes to win elections for parties and candidates and to support doctrines they are against. If this is constitutional the First Amendment is not the charter of political and religious liberty its sponsors believed it to be. James Madison, who wrote the Amendment, said in arguing for religious liberty that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever." [14] And Thomas Jefferson said that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." [15] These views of Madison and Jefferson authentically represent the philosophy embodied in the safeguards of the First Amendment. That Amendment leaves the Federal Government no power whatever to compel one man to expend his energy, his time or his money to advance the fortunes of candidates he would like to see defeated or to urge ideologies and causes he believes would be hurtful to the country.

The Court holds that § 2, Eleventh denies "unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." While I do not so construe § 2, Eleventh, I want to make clear that I believe the First Amendment bars use of dues extorted from an employee by law for the promotion of causes, doctrines and laws that unions generally favor to

---

[14] 1 Stokes, Church and State in the United States, 391 (1950).

[15] Brant, James Madison: The Nationalist, 354 (1948).

help the unions, as well as any other political purposes. I think workers have as much right to their own views about matters affecting unions as they have to views about other matters in the fields of politics and economics. Indeed, some of their most strongly held views are apt to be precisely on the subject of unions, just as questions of law reform, court procedure, selection of judges and other aspects of the "administration of justice" give rise to some of the deepest and most irreconcilable differences among lawyers. In my view, § 2, Eleventh can constitutionally authorize no more than to make a worker pay dues to a union for the sole purpose of defraying the cost of acting as his bargaining agent. Our Government has no more power to compel individuals to support union programs or union publications than it has to compel the support of political programs, employer programs or church programs. And the First Amendment, fairly construed, deprives the Government of all power to make any person pay out one single penny against his will to be used in any way to advocate doctrines or views he is against, whether economic, scientific, political, religious or any other.[16]

I would therefore hold that § 2, Eleventh of the Railway Labor Act, in authorizing application of the union-shop contract to the named protesting employees who are appellees here, violates the freedom of speech guarantee of the First Amendment.

## IV.

The remedy:

The Georgia court enjoined the unions and the railroads from certain future activities under the contract and also required repayment of dues paid by three employees who had protested use of union funds to support

---

[16] Cf. *Everson* v. *Board of Education*, 330 U. S. 1, 16.

candidates or advocate views the protesting employees were against.

I am not so sure as the Court that the injunction bars "the collection of all funds from anyone who can show that he is opposed to the expenditure of any of his money for political purposes which he disapproves." So construed the injunction would take away the First Amendment right of employees to contribute their money voluntarily to a collective fund to be used to support and oppose candidates and causes even though individual contributors might disagree with particular choices of the group. So far as it may be ambiguous in this respect, I think the injunction should be modified to make sure that it does not interfere with the valuable rights of citizens to make their individual voices heard through voluntary collective action.

For much the same basic reasons I think the injunction is too broad in that it runs not only in favor of the six protesting employees but also in favor of the "class they represent." No one of that "class" is shown to have protested at all. The State Supreme Court nevertheless rejected the unions' contention that the so-called class was so indefinite, and its members so lacking in common, identifiable interests and mental attitudes, that a decree purporting to bind all of them, the railroads, the individual defendants and the unions, would not comport with the due process requirements of the Fifth and Fourteenth Amendments. For reasons to be stated, I agree with this contention of the unions and consequently would hold that the judgment here cannot stand insofar as it purports finally to adjudicate rights as between the party defendants and railroad employees who were neither named party plaintiffs nor intervenors in the suit.

The trial court defined the "class" as composed of "all non-operating employees of the railroad defendants affected by, and opposed to, the . . . union shop agree-

ments, who also are opposed to the collection and use of periodic dues, fees and assessments for support of ideological and political doctrines and candidates and legislative programs . . . ." [17]  As applied to the facts here, this class, as defined, could include employees not only from Georgia, but also from Florida, Alabama, North Carolina, South Carolina, Tennessee, Louisiana, Illinois, Virginia, Ohio, Indiana, Missouri, Mississippi, Kentucky and the District of Columbia.  Genuine class actions result in binding judgments either for or against each member of the class.[18]  Obviously, to make a judgment binding, the parties for or against whom it is to operate must be identifiable when the judgment is rendered. That would not be possible here since the only employees included in the class would be those who personally oppose the views they allege the union is using their dues to promote.  This would make the "class" depend on the views entertained by each member, views which may change from day to day or year to year.  Under these circumstances, when this decree was rendered neither the court nor the adverse parties nor anyone else could know, with certainty, to what individuals the unions owed a duty under the decree.  In *Hansberry* v. *Lee,* 311 U. S.

---

[17] The trial court went on to include in the class other employees who opposed the use of union funds for any purposes "other than the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms or other conditions of employment or the handling of disputes relating to the above."  I read the two opinions of the Georgia Supreme Court, however, as limiting its holding to the precise question of whether the First Amendment is violated by the compulsory legal requirement that employees pay dues and other fees which are partly used to propagate political and ideological views obnoxious to the employees.  I consequently do not reach or consider the different question lurking in this part of the trial court's definition of class.

[18] See, *e. g., Supreme Tribe of Ben-Hur* v. *Cauble,* 255 U. S. 356, 367.

32, 44, this Court pointed out the insuperable obstacles in attempting to treat as members of the same class parties to a contract such as the one here, some of whom might prefer to have the contract enforced and some of whom might not. Notice to persons whose rights are to be adjudicated is too important an element of our system of justice to permit a holding that this Georgia action has finally determined the issues for all the unidentifiable members of this "class" of plaintiffs spread territorially all the way from Florida to Illinois and from the District of Columbia to Missouri. After all the class suit doctrine is only a narrow judicially created exception to the rule that a case or controversy involves litigants who have been duly notified and given an opportunity to be present in court either in person or by counsel.[19] I would hold that there was no known common interest among the members of the described class here which justified this class action. From the very nature of the rights asserted, which depended on the unknown, perhaps fluctuating mental attitudes of employees, the rights of each employee were the basis for separable claims, in which the relief for each might vary as it did here as to the amount of damages awarded. Under these circumstances the class judgment should not stand.

The decree, modified to eliminate its class aspect, does not unconditionally forbid the application of the contract to all people under all circumstances, as did the one we struck down in the *Hanson* case. The decree so modified would simply forbid use of the union-shop contract to bar employment of the six protesting employees so long as the unions do not discontinue the practice of spending union funds to support any causes or doctrines, political, economic or other, over the expressed objection of the six particular employees. Other employees who have not

---

[19] Cf. *Hansberry* v. *Lee,* 311 U. S., at 41–42.

protested are of course in the entirely different position of voluntary or acquiescing dues payers, which they have every right to be, and since they have asked for no relief the decree in this case should not affect them. Thus modified I think the relief afforded by the decree is justified.

The decree requires the union to refund dues, fees and assessments paid under protest by three of the complaining employees and exempts the six complaining employees from the payment of any union dues, fees or assessments so long as funds so received are used by the union to promote causes they are against. The state court found that these payments had been and would be made by these employees only because they had been compelled to join the union to save their jobs, despite their objections to paying the union so long as it used its funds for candidates, parties and ideologies contrary to these employees' wishes. The Court does not challenge this finding but nevertheless holds that relieving protesting workers of all payment of dues would somehow interfere with the union's statutory duty to act as a bargaining agent. In the first place, this would interfere with the union's activities only to the extent that it bars compulsion of dues payments from protesting workers to be used in some unknown part for unconstitutional purposes, and I think it perfectly proper to hold that such payments cannot be compelled. Furthermore, I think the remedy suggested by the Court will work a far greater interference with the union's bargaining activities because it will impose much greater trial and accounting burdens on both unions and workers. The Court's remedy is to give the wronged employees a right to a refund limited either to "the proportion of the union's total expenditures made for such political activities" or to the "proportion . . . [of] expenditures for political purposes which he had advised the union he disapproved." It may be that courts and lawyers with

sufficient skill in accounting, algebra, geometry, trigonometry and calculus will be able to extract the proper microscopic answer from the voluminous and complex accounting records of the local, national and international unions involved. It seems to me, however, that while the Court's remedy may prove very lucrative to special masters, accountants and lawyers, this formula, with its attendant trial burdens, promises little hope for financial recompense to the individual workers whose First Amendment freedoms have been flagrantly violated. Undoubtedly, at the conclusion of this long exploration of accounting intricacies, many courts could with plausibility dismiss the workers' claims as *de minimis* when measured only in dollars and cents.

I cannot agree to treat so lightly the value of a man's constitutional right to be wholly free from any sort of governmental compulsion in the expression of opinions. It should not be forgotten that many men have left their native lands, languished in prison, and even lost their lives, rather than give support to ideas they were conscientiously against. The three workers who paid under protest here were forced under authority of a federal statute to pay *all* current dues or lose their jobs. They should get back *all* they paid with interest.

Unions composed of a voluntary membership, like all other voluntary groups, should be free in this country to fight in the public forum to advance their own causes, to promote their choice of candidates and parties and to work for the doctrines or the laws they favor. But to the extent that Government steps in to force people to help espouse the particular causes of a group, that group—whether composed of railroad workers or lawyers—loses its status as a voluntary group. The reason our Constitution endowed individuals with freedom to think and speak and advocate was to free people from the blighting effect of either a partial or a complete governmental

monopoly of ideas. Labor unions have been peculiar beneficiaries of that salutary constitutional principle, and lawyers, I think, are charged with a peculiar responsibility to preserve and protect this principle of constitutional freedom, even for themselves. A violation of it, however small, is, in my judgment, prohibited by the First Amendment and should be stopped dead in its tracks on its first appearance. With so vital a principle at stake, I cannot agree to the imposition of parsimonious limitations on the kind of decree the courts below can fashion in their efforts to afford effective protection to these priceless constitutional rights.

I would affirm the judgment of the Georgia Supreme Court, with the modifications I have suggested.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, dissenting.

Appellant unions were the collective bargaining representatives of the "non-operating" employees of the Southern Railway. Appellees, six individual railway employees, commenced this action in the Superior Court of Bibb County, Georgia, seeking a declaration of invalidity and an injunction to prevent enforcement of a union-shop agreement, made under the authority of § 2, Eleventh of the Railway Labor Act, as amended in 1951, on the ground that the contract was in violation of Georgia law and rights secured by the First, Fifth, Ninth, and Tenth Amendments of the United States Constitution. The suit was brought as a class action on behalf of "all those employees or former employees of the railroad defendants affected by and opposed to the union-shop agreement who are also opposed to the use of the periodic dues, fees and assessments which they have been, are and will be required to pay to support ideological and political doctrines and candidates and legislative programs. . . ." The monthly dues ranged from $2.25 to

§3. The petition alleged that the plaintiffs opposed and were unwilling voluntarily to support the "ideological and political doctrines and candidates" for which union dues and assessments were collected under the union-shop agreement and would be used "in substantial part . . . to support."

The Georgia trial court's decision dismissing the complaint for failure to state a cause of action was reversed by the Supreme Court of Georgia. 213 Ga. 279, 99 S. E. 2d 101. Upon remand, the parties stipulated the above allegations, and the plaintiffs offered proof of the amount of union funds which went to the legislative, political, and educational departments of the unions and the controlling organs of the AFL–CIO. The trial court made, *inter alia,* the following findings: the unions' funds had been expended in "substantial amounts" to promote political doctrines and legislative programs which the plaintiffs opposed; these funds had been used in "substantial amounts to impose upon plaintiffs . . . conformity to those doctrines"; such use of funds was "not reasonably necessary to collective bargaining or to maintaining the existence and position of said union defendants as effective bargaining agents." The need of unions to engage in what are loosely described as political activities as means of promoting—if not to achieving—the purposes of their existence, the extent to which this practice has become an essential part of the American labor movement and more particularly of railroad labor unions, the relation of these means to the ends of collective bargaining, were matters not canvassed at trial nor judicially noticed. Nor was it claimed that the slightest barrier had been interposed against the fullest exercise by the plaintiffs of their freedom of speech in any form or in any forum. Since these matters were not canvassed, no findings upon them were made.

The trial court permanently enjoined enforcement of the agreement so long as the unions continued to engage "in the improper and unlawful activities described." It declared § 2, Eleventh of the Railway Labor Act unconstitutional insofar as it permitted the exaction of dues utilized in promoting so-called political activities from union members disapproving such expenditures. The unions were also ordered to repay the dues and assessments previously paid by the individual plaintiffs. The Georgia Supreme Court affirmed this judgment, 215 Ga. 27, 108 S. E. 2d 796, and on appeal to this Court, under 28 U. S. C. § 1257 (1), probable jurisdiction was noted. 361 U. S. 807.

I completely defer to the guiding principle that this Court will abstain from entertaining a serious constitutional question when a statute may fairly be construed so as to avoid the issue, but am unable to accept the restrictive interpretation that the Court gives to § 2, Eleventh of the Railway Labor Act. After quoting the relevant canon for constitutional adjudication from *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401,[1] Mr. Justice Cardozo for the whole Court enunciated the complementary principle:

> "But avoidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered." *Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379.

The Court-devised precept against avoidable conflict with Congress through unnecessary constitutional adjudication

---

[1] "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."

is not a requirement to distort an enactment in order to escape such adjudication. Respect for the doctrine demands and only permits that we extract an interpretation which shies off constitutional controversy, *provided* such interpretation is consonant with a fair reading of a statute.

And so the question before us is whether § 2, Eleventh of the Railway Labor Act can untorturingly be read to bar activities of railway unions, which have bargained in accordance with federal law for a union shop, whereby they are forbidden to spend union dues for purposes that have uniformly and extensively been so long pursued as to have become commonplace, settled, conventional trade-union practices. No consideration relevant to construction sustains such a restrictive reading.

The statutory provision cannot be meaningfully construed except against the background and presupposition of what is loosely called political activity of American trade unions in general and railroad unions in particular— activity indissolubly relating to the immediate economic and social concerns that are the *raison d'être* of unions. It would be pedantic heavily to document this familiar truth of industrial history and commonplace of trade-union life. To write the history of the Brotherhoods, the United Mine Workers, the Steel Workers, the Amalgamated Clothing Workers, the International Ladies Garment Workers, the United Auto Workers, and leave out their so-called political activities and expenditures for them, would be sheer mutilation. Suffice it to recall a few illustrative manifestations. The AFL, surely the conservative labor group, sponsored as early as 1893 an extensive program of political demands calling for compulsory education, an eight-hour day, employer tort liability, and other social reforms.[2] The fiercely contested

---

[2] Taft, The A. F. of L. in the Time of Gompers, p. 71 (1957).

Adamson Act of 1916, see *Wilson* v. *New*, 243 U. S. 332, was a direct result of railway union pressures exerted upon both the Congress and the President.[3] More specifically, the weekly publication "Labor"—an expenditure under attack in this case—has since 1919 been the organ of the railroad brotherhoods which finance it. Its files through the years show its preoccupation with legislative measures that touch the vitals of labor's interests and with the men and parties who effectuate them. This aspect—call it the political side—is as organic, as inured a part of the philosophy and practice of railway unions as their immediate bread-and-butter concerns.

Viewed in this light, there is a total absence in the text, the context, the history and the purpose of the legislation under review of any indication that Congress, in authorizing union-shop agreements, attributed to unions and restricted them to an artificial, non-prevalent scope of activities in the expenditure of their funds. An inference that Congress legislated regarding expenditure control in contradiction to prevailing practices ought to be better founded than on complete silence. The aim of the 1951 legislation, clearly stated in the congressional reports, was to eliminate "free riders" in the industry [4]—to make possible "the sharing of the burden of maintenance by all of the beneficiaries of union activity." [5] To suggest that this language covertly meant to encompass any less than the maintenance of those activities normally engaged in by unions is to withdraw life from law and to say that Congress dealt with artificialities and not with railway unions as they were and as they functioned.

---

[3] Perlman and Taft, History of Labor in the United States, 1896–1932, pp. 380–385.

[4] S. Rep. No. 2262, 81st Cong., 2d Sess. 2–3.

[5] Remarks of Mr. Harrison, Hearings, House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., p. 253.

The hearings and debates lend not the slightest support to a construction of the amendment which would restrict the uses to which union funds had, at the time of the union-shop amendment, been conventionally put. To be sure, the legislative record does not spell out the obvious. The absence of any showing of concern about unions' expenditures in "political" areas—especially when the issue was briefly raised [6]—only buttresses the conclusion that Congress intended to leave unions free to do that which unions had been and were doing. It is surely fanciful to conclude that this verbal vacuity implies that Congress meant its amendment to be read as providing that members of the union may restrict their dues solely for financing the technical process of collective bargaining.

There were specific safeguards protective of minority rights. These safeguards were directed solely toward the protection of those who might otherwise find themselves barred from union membership—*viz.*, Negroes and those who had been long-time opponents of the unions. The only reference to free speech in the record of the enactment was made by the President of the Norfolk & Western Railroad Company during the hearings before the House Subcommittee. His remarks were related to restrictive provisions in some union constitutions which suppressed the right of a dissatisfied member to voice his criticism upon pain of expulsion.[7] No such claim is remotely before us.[8] The sole reason for clarifying the proviso to the amendment so that payment

---

[6] 96 Cong. Rec. 17049–17050; Hearings, Subcommittee of the Senate Committee on Labor and Public Welfare on S. 3295, 81st Cong., 2d Sess., pp. 173–174.

[7] Remarks of Mr. Smith, Hearings, House Committee on Interstate and Foreign Commerce, 81st Cong., 2d Sess., pp. 115–116.

[8] Compare *Railway Employes' Dept.* v. *Hanson*, 351 U. S. 225, 236–237, n. 8.

of dues was explicitly declared to be the only legitimate condition of union membership was the continuing fear of lack of protection for unpopular minorities. There is no mention of political expenditures in any of the references. From this wasteland of material it is strange to find not only that "A congressional concern over possible impingements on the interests of individual dissenters from union policies is therefore discernible," but so discernible that a construction must be placed upon the statute that neither its terms nor the accustomed habits of union life remotely justify.

None of the parties in interest at any time suggested the possibility that the statute be construed in the manner now suggested. Neither the United States, the individual dissident members, the railroad unions, the railroads, the AFL–CIO, the Railway Labor Executives' Association, nor any other *amicus curiae* suggested that the statute could be emasculated in the manner now proposed. Of course we are not confined by the absence of such a claim, but it is significant that a construction now found to be reasonable never occurred to the litigants in the two arguments here.

I cannot attribute to Congress that *sub silentio* it meant to bar railway unions under a union-shop agreement from expending their funds in their traditional manner. How easy it would have been to give at least a hint that such was its purpose. The claim that these expenditures infringe the appellees' constitutional rights under the First Amendment must therefore be faced.

In *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, this Court had to pass on the validity of § 2, Eleventh of the Railway Labor Act, which provided that union-shop agreements entered into between a carrier and a duly designated labor organization shall be valid notwithstanding any other "statute or law of the United States, or

Territory thereof, or of any State." [9]  We held that in its exercise of the power to regulate commerce, "the choice by the Congress of the union shop as a stabilizing force [in industrial disputes] seems to us to be an allowable one," and that the plaintiffs' claims under the First and Fifth Amendments were without merit.

The record before the Court in *Hanson* clearly indicated that dues would be used to further what are normally described as political and legislative ends.  And it surely can be said that the Court was not ignorant of a fact that everyone else knew.  Union constitutions were in evidence which authorized the use of union funds for political magazines, for support of lobbying groups, and for urging union members to vote for union-approved candidates.[10]  The contention now raised by plaintiffs

[9] The pertinent portion of the section follows:

"Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

."(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."  64 Stat. 1238, 45 U. S. C. § 152, Eleventh.

[10] See the provisions of the constitutions of the Brotherhood of Maintenance of Way Employees, the Brotherhood of Railway Carmen of America, and the International Association of Machinists before the Court in the *Hanson* record, pp. 103–143.

was succinctly stated by the *Hanson* plaintiffs in their brief.[11]  We indicated that we were deciding the merits of the complaint on all the allegations and proof before us.  "On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar."  351 U. S., at 238.

One would suppose that *Hanson's* reasoning disposed of the present suit.  The Georgia Supreme Court, however, in reversing the initial dismissal of the action by the lower court, relied upon the following reservation in our opinion: "if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case."  351 U. S., at 238.  The use of union dues to promote relevant and effective means of realizing the purposes for which unions exist does not constitute a utilization of dues "as a cover for forcing ideological conformity" in any fair reading of those words.  It will come as startling and fanciful news to the railroad unions and the whole labor movement that in using union funds for promoting and opposing legislative measures of concern to their members they were engaged in under-cover operations.  "Cover" implies a disguise, some sham; "forcing . . . conformity" means coercing avowal of a belief not entertained.  Plaintiffs here are in no way subjected to such suppression of their true beliefs or sponsorship of views they do not hold.  Nor are they forced to join a sham organization which does not participate in collective bargaining functions, but only serves as a conduit of funds for ideological propaganda.  A totally different problem than the one before the Court would be presented by provisions of union constitutions which in fact prohibited

---

[11] Appellees' brief, pp. 16–17, 65.

members from sponsoring views which the union opposed,[12] or which enabled officers to sponsor views not representative of the union.

Nevertheless, we unanimously held that the plaintiffs in *Hanson* had not been denied any right protected by the First Amendment. Despite our holding, the gist of the complaint here is that the expenditure of a portion of mandatory funds for political objectives denies free speech—the right to speak or to remain silent—to members who oppose, against the constituted authority of union desires, this use of their union dues. No one's desire or power to speak his mind is checked or curbed. The individual member may express his views in any public or private forum as freely as he could before the union collected his dues. Federal taxes also may diminish the vigor with which a citizen can give partisan support to a political belief, but as yet no one would place such an impediment to making one's views effective within the reach of constitutionally protected "free speech."

This is too fine-spun a claim for constitutional recognition. The framers of the Bill of Rights lived in an era when overhanging threats to conduct deemed "seditious" and *lettres de cachet* were current issues. Their concern was in protecting the right of the individual freely to express himself—especially his political beliefs—in a public forum, untrammeled by fear of punishment or of governmental censure.

But were we to assume, *arguendo,* that the plaintiffs have alleged a valid constitutional objection if Congress had specifically ordered the result, we must con-

---

[12] "B. The Grand Lodge Constitution of the Brotherhood Railway Carmen of America prohibits members from 'interfering with legislative matters affecting national, state, territorial, dominion or provincial legislation, adversely affecting the interests of our members.' § 64." 351 U. S., at 237, n. 8.

sider the difference between such compulsion and the absence of compulsion when Congress acts as platonically as it did, in a wholly non-coercive way. Congress has not commanded that the railroads shall employ only those workers who are members of authorized unions. Congress has only given leave to a bargaining representative, democratically elected by a majority of workers, to enter into a particular contractual provision arrived at under the give-and-take of duly safeguarded bargaining procedures. (The statute forbids distortion of these procedures as, for instance, through racial discrimination. *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192.) Congress itself emphasized this vital distinction between authorization and compulsion. S. Rep. No. 2262, 81st Cong., 2d Sess. 2. And this Court in *Hanson* noted that "The union shop provision of the Railway Labor Act is only permissive. Congress has not . . . required carriers and employees to enter into union shop agreements." 351 U. S., at 231. When we speak of the Government "acting" in permitting the union shop, the scope and force of what Congress has done must be heeded. There is not a trace of compulsion involved— no exercise of restriction by Congress on the freedom of the carriers and the unions. On the contrary, Congress expanded their freedom of action. Congress lifted limitations upon free action by parties bargaining at arm's length.[13]

---

[13] To ignore this distinction would be to go far beyond the severely criticized, indeed rather discredited, case of *United States* v. *Butler,* 297 U. S. 1, which found coercive implications in the processing tax of the Agricultural Adjustment Act. The dissenting views of Mr. Justice Stone, concurred in by Brandeis and Cardozo, JJ., may surely be said to have won the day: "Although the farmer is placed under no legal compulsion to reduce acreage, it is said that the mere offer of compensation for so doing is a species of economic coercion which operates with the same legal force and effect as though the

The plaintiffs have not been deprived of the right to participate in determining union policies or to assert their respective weight in defining the purposes for which union dues may be expended. Responsive to the actualities of our industrial society, in which unions as such play the role that they do, the law regards a union as a self-contained, legal personality exercising rights and subject to responsibilities wholly distinct from its individual members. See *United Mine Workers of America* v. *Coronado Coal Co.*, 259 U. S. 344. It is a commonplace of all organizations that a minority of a legally recognized group may at times see an organization's funds used for promotion of ideas opposed by the minority. The analogies are numerous. On the largest scale, the Federal Government expends revenue collected from individual taxpayers to propagandize ideas which many taxpayers oppose. Or, as this Court noted in *Hanson,* many state laws compel membership in the integrated bar as a prerequisite to practicing law,[14] and the bar association

curtailment were made mandatory by Act of Congress." 297 U. S., at 81.

For an analysis of the 1951 Amendment leading to a narrow scope of its constitutional implications, see Wellington, The Constitution, the Labor Union, and "Governmental Action," 70 Yale L. J. 345, 352–360, 363–371.

[14] The following States have integrated bars: Alabama (Ala. Code, Tit. 46, § 30); Alaska (Alaska Laws Ann. § 35–2–77a to § 35–2–77o); Arizona (Ariz. Code Ann. § 32–302); California (Cal. Bus. & Prof. Code § 6002); Florida (Fla. Stat. Ann., Vol. 31, pp. 699–713 (court rule)); Idaho (Idaho Code § 3–408 to § 3–417); Kentucky (Ky. Rev. Stat. § 30.170); Louisiana (La. Rev. Stat. 37:211; Art. IV, Articles of Incorporation, La. State Bar Assn., 4 Dart, Annotations to La. Stat. 1950, p. 29); Michigan (Mich. Stat. Ann. § 27–101); Mississippi (Miss. Code § 8696); Missouri (Mo. Supreme Court Rule 6, 352 Mo. xxix); Nebraska (Neb. Supreme Court Rule IV, *In re Integration of Nebraska State Bar Assn.,* 133 Neb. 283, 275 N. W. 265); Nevada (Nev. Rev. Stat. 7.270–7.600); New Mexico (N. Mex. Stat. Ann. § 18–1–2 to § 18–1–24); North Carolina (N. C. Gen. Stat. § 84–16); North Dakota (N. D. Rev. Code § 27–1202); Oklahoma

uses its funds to urge legislation of which individual members often disapprove. The present case is, as the Court in *Hanson* asserted, indistinguishable from the issues raised by those who find constitutional difficulties with the integrated bar.[15] If our statement in *Hanson* carried any meaning, it was an unqualified recognition that legislation providing for an integrated bar, exercising familiar functions, is subject to no infirmity derived from the First Amendment. Again, under the Securities Exchange Act of 1934, Congress specifically authorized the formation of "national securities associations," membership in which is of practical necessity to many brokers and dealers.[16] The Association has urged the passage of

(*In re Integration of the Bar of Oklahoma,* 185 Okla. 505, 95 P. 2d 113, amended by Okla. Supreme Court rules approved October 6, 1958, Okla. Stat. Ann., 1960 Cum. Ann. Pocket Part, Tit. 5, c. 1, App. 1); Oregon (Ore. Rev. Stat. §§ 9.010–9.210); South Dakota (S. D. Code § 32.1114); Texas (Vern. Civ. Stat., Art. 320a–1, § 3); Utah (Utah Code Ann. § 78–51–1 to § 78–51–25); Virginia (Va. Code § 54–49); Washington (Wash. Rev. Code § 2.48.020); West Virginia (W. Va. Code Ann. 51–1–4a); Wisconsin (Wis. Stat. § 256.31, 5 Wis. 2d 618, 627, 93 N. W. 2d 601, 605); Wyoming (Wyo. Stat. § 5–22; Wyo. Supreme Court Rules for State Bar, Rule 5).

[15] So far as reported, all decisions have upheld the integrated bar against constitutional attack. *Carpenter* v. *State Bar of California,* 211 Cal. 358, 295 P. 23; *Herron* v. *State Bar of California,* 24 Cal. 2d 53, 147 P. 2d 543; *Petition of Florida State Bar Assn.,* 40 So. 2d 902; *In re Mundy,* 202 La. 41, 11 So. 2d 398; *Ayres* v. *Hadaway,* 303 Mich. 589, 6 N. W. 2d 905; *In re Scott,* 53 Nev. 24, 292 P. 291; *In re Platz,* 60 Nev. 296, 108 P. 2d 858; *In re Gibson,* 35 N. Mex. 550, 4 P. 2d 643; *Kelley* v. *State Bar of Oklahoma,* 148 Okla. 282, 298 P. 623; *Lathrop* v. *Donohue,* 10 Wis. 2d 230, 102 N. W. 2d 404, affirmed, *post,* p. 820.

[16] The Maloney Act of 1938 added § 15A to the Securities Exchange Act of 1934. 52 Stat. 1070, 15 U. S. C. § 78o–3. In order to be registered, a number of statutory standards must be met. The statute specifically requires that an association's rules provide for democratic representation of the membership and that dues be equitably allocated. See § 15A (b) (5) and (6). Only one association, the National Association of Securities Dealers, Inc., has ever applied

several legislative reforms [17] which one can confidently assume did not represent the convictions of all members. To come closer to the heart of the immediate matter, is the union's choice of when to picket or to go out on strike unconstitutional? Picketing is still deemed also a form of speech,[18] but surely the union's decision to strike under its statutory aegis as a bargaining unit is not an unconstitutional compulsion forced upon members who strongly oppose a strike, as minorities not infrequently do. Indeed, legislative reform intended to insure the fair representation of the minority workers in internal union politics [19] would be redundant if, despite all precautions, the union were constitutionally forbidden because of minority opposition to spend money in accordance with the majority's desires.

for or been granted registration. NASD membership comprises roughly three-quarters of all brokers and dealers registered with the Securities and Exchange Commission. Loss, Securities Regulation 766–67 (1951, Supp. 1955). Sections 15A (i) and (n) of the Act authorize the NASD to formulate rules which stipulate that members shall refuse to deal with non-members with immunity from the anti-trust laws. See S. Rep. No. 1455, 75th Cong., 3d Sess. 8–9 (1938); Loss, *op. cit., supra,* 769–770. The Commission has stated that it is "virtually impossible for a dealer who is not a member of the NASD to participate in a distribution of important size." *National Association of Securities Dealers, Inc.,* 19. S. E. C. 424, 441.

[17] In 1949 Senator Frear introduced a bill which would have greatly expanded the applicability of the registration, proxy, and insider trading provisions of the Securities Exchange Act to small corporations. S. 2408, 81st Cong., 1st Sess. The NASD supported the passage of the proposed legislation, and testified on its behalf before the Senate subcommittee. Hearings Before Subcommittee of Senate Committee on Banking and Currency on S. 2408, 81st Cong., 2d Sess. 53–62 (1950); Loss, *op. cit., supra,* 620, 621.

[18] To this extent *Thornhill* v. *Alabama,* 310 U. S. 88, 101–106, has survived and was applied in *Chauffeurs Union* v. *Newell,* 356 U. S. 341.

[19] See Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 829–851.

How unrealistic the views of plaintiffs are becomes manifest in light of the purpose of the legislative scheme in authorizing the union shop and the practical necessity for unions to participate in what as a matter of analytical fragmentation may be called political activities. The 1951 Amendment of the Railway Labor Act, which enacted § 2, Eleventh, was passed in an effort to make more equitable the sharing of costs of collective bargaining among all the workers whom the bargaining agent represented. H. R. Rep. No. 2811, 81st Cong., 2d Sess. 4; Hearings, House Committee on Interstate and Foreign Commerce on H. R. 7789, 81st Cong., 2d Sess. 10, 11, 29, 49–50; Hearings, Subcommittee of the Senate Committee on Labor and Public Welfare on S. 3295, 81st Cong., 2d Sess. 15–16, 130, 154, 170. Prior to the passage of this Amendment, there was no way in which the union could compel non-union members in the bargaining unit to contribute to the expenses incurred in seeking contractual provisions from the carrier that would redound to the advantage of all its employees. The main reason why prior law had forbidden union shops in the railroad industry is stated in the Senate Report to the 1951 Amendment:

"The present prohibitions against all forms of union security agreements and the check-off were made part of the Railway Labor Act in 1934. They were enacted into law against the background of employer use of these agreements as devices for establishing and maintaining company unions, thus effectively depriving a substantial number of employees of their right to bargain collectively. It is estimated that in 1934 there were over 700 agreements between the carriers and unions alleged to be company unions. These agreements represented over 20 percent of the total number of agreements in the industry.

"It was because of this situation that labor organizations agreed to the present statutory prohibitions against union security agreements. An effort was made to limit the prohibition to company unions. This, however, proved unsuccessful; and in order to reach the problem of company control over unions, labor organizations accepted the more general prohibitions which also deprived the national organizations of seeking union security agreements and check-off provisions. . . .

"Since the enactment of the 1934 amendments, company unions have practically disappeared." S. Rep. No. 2262, 81st Cong., 2d Sess. 2–3. See also H. R. Rep. No. 2811, 81st Cong., 2d Sess. 3.

Nothing was further from congressional purpose than to be concerned with restrictions upon the right to speak. Its purpose was to eliminate "free riders" in the bargaining unit. Inroads on free speech were not remotely involved in the legislative process. They were in nobody's mind. Congress legislated to correct what it found to be abuses in the domain of promoting industrial peace. This Court would stray beyond its powers were it to erect a far-fetched claim, derived from some ultimate relation between an obviously valid aim of legislation and an abstract conception of freedom, into a constitutional right.

For us to hold that these defendant unions may not expend their moneys for political and legislative purposes would be completely to ignore the long history of union conduct and its pervasive acceptance in our political life. American labor's initial role in shaping legislation dates back 130 years.[20] With the coming of the AFL in 1886, labor on a national scale was committed not to act as a

[20] 1 Commons, History of Labor in the United States, 318–325 (1918).

class party but to maintain a program of political action in furtherance of its industrial standards.[21]   British trade unions were supporting members of the House of Commons as early as 1867.[22]   The Canadian Trades Congress in 1894 debated whether political action should be the main objective of the labor force.[23]   And in a recent Australian case, the High Court upheld the right of a union to expel a member who refused to pay a political levy.[24]   That Britain, Canada and Australia have no explicit First Amendment is beside the point.   For one thing, the freedoms safeguarded in terms in the First Amendment are deeply rooted and respected in the British tradition, and are part of legal presuppositions in Canada and Australia.   And in relation to our immediate concern, the British Commonwealth experience establishes the pertinence of political means for realizing basic trade-union interests.

The expenditures revealed by the AFL–CIO Executive Council Reports emphasize that labor's participation in urging legislation and candidacies is a major one.   In the last three fiscal years, the Committee on Political Education (COPE) expended a total of $1,681,990.42; the AFL–CIO News cost $756,591.99; the Legislative Department reported total expenses of $741,918.24.[25]   Yet the Georgia trial court has found that these funds were not reasonably related to the unions' role as collective bargaining agents.   One could scarcely call this a finding of fact by which this Court is bound, or even one

---

[21] Taft, The A. F. of L. in the Time of Gompers, 289–292 (1957); Bakke and Kerr, Unions, Management and the Public, 215 (1948).

[22] 3 Cole, A Short History of the British Working Class Movement, 56 (2d ed. 1937).

[23] Logan, Trade Unions in Canada, 59–60 (1948).

[24] *William* v. *Hursey*, 33 A. L. J. R. 269 (1959).

[25] These are the totals of the figures for 1957, 1958, and 1959 reported in Proceedings of the AFL–CIO Constitutional Convention, Vol. II, pp. 17–19 (1959) and *id.*, pp. 17–19 (1957).

of law. It is a baseless dogmatic assertion that flies in the face of fact. It rests on a mere listing of unions' expenditures and an exhibit of labor publications. The passage of the Adamson Act [26] in 1916, establishing the eight-hour day for the railroad industry, affords positive proof that labor may achieve its desired result through legislation after bargaining techniques fail. See *Wilson* v. *New, supra,* at 340–343. If higher wages and shorter hours are prime ends of a union in bargaining collectively, these goals may often be more effectively achieved by lobbying and the support of sympathetic candidates. In 1960 there were at least eighteen railway labor organizations registered as congressional lobby groups.[27]

When one runs down the detailed list of national and international problems on which the AFL–CIO speaks, it seems rather naive for a court to conclude—as did the trial court—that the union expenditures were "not reasonably necessary to collective bargaining or to maintaining the existence and position of said union defendants as effective bargaining agents." The notion that economic and political concerns are separable is pre-Victorian. Presidents of the United States and Committees of Congress invite views of labor on matters not immediately concerned with wages, hours, and conditions of employment.[28] And this Court accepts briefs as *amici* from the AFL–CIO on issues that cannot be called industrial, in any circumscribed sense. It is not true in life that political protection is irrelevant to, and insulated from, economic interests. It is not true for

---

[26] 39 Stat. 721, 45 U. S. C. §§ 65–66.

[27] Letters from Clerk of House of Representatives to Supreme Court Librarian, May 5, 1960; May 10, 1961.

[28] For a recent example, see the statement of Stanley H. Ruttenberg, Director of Research for the AFL–CIO, on pending tax legislation before the House Ways and Means Committee, reported in part in the New York Times, May 12, 1961, p. 14, col. 3.

industry or finance.[29] Neither is it true for labor. It disrespects the wise, hardheaded men who were the authors of our Constitution and our Bill of Rights to conclude that their scheme of government requires what the facts of life reject. As Mr. Justice Rutledge stated: "To say that labor unions as such have nothing of value to contribute to that process [the electoral process] and no vital or legitimate interest in it is to ignore the obvious facts of political and economic life and of their increasing interrelationship in modern society." *United States* v. *CIO,* 335 U. S. 106, 129, 144 (concurring opinion joined in by Black, Douglas, and Murphy, JJ). Fifty years ago this Court held that there was no connection between outlawry of "yellow dog contracts" on interstate railroads and interstate commerce, and therefore found unconstitutional legislation directed against the evils of these agreements. Is it any more consonant with the facts of life today, than was this holding in *Adair* v. *United States,* 208 U. S. 161, to say that the tax policies of the National Government—the scheme of rates and exemptions— have no close relation to the wages of workers; that legislative developments like the Tennessee Valley Authority do not intimately touch the lives of workers within their respective regions; that national measures furthering health and education do not directly bear on the lives of industrial workers; that candidates who sup-

---

[29] A contested question in the corporate field is the legitimacy of corporate charitable contributions. This presents a not dissimilar problem whether the Government may authorize an organization to expend money for a purpose outside the corporate business to which an individual stockholder is opposed. A shareholder who joined prior to the authorization and who therefore cannot be said to have impliedly consented surely is as directly affected as is the member of a union shop. See *A. P. Smith Mfg. Co.* v. *Barlow,* 13 N. J. 145, 98 A. 2d 581, which upheld against federal constitutional attack a state statute which authorized New Jersey corporations to make contributions to charity. The amounts involved were substantial.

port these movements do not stand in different relation to labor's narrowest economic interests than avowed opponents of these measures? Is it respectful of the modes of thought of Madison and Jefferson projected into our day to attribute to them the view that the First Amendment must be construed to bar unions from concluding, by due procedural steps, that civil-rights legislation conduces to their interest, thereby prohibiting union funds to be expended to promote passage of such measures? [30]

Congress was not unaware that railroad unions might use these mandatory contributions for furthering their economic interests through political channels. See 96 Cong. Rec. 17049–17050. That such consequences from authorizing compulsory union membership were to be foreseen had been indicated to committees of Congress less than four years earlier when the union-shop provisions of the Taft-Hartley Act were being debated. Hearings, Senate Committee on Labor and Public Welfare on S. 55, 80th Cong., 1st Sess., pp. 726, 1452, 1455–1456, 1687, 2065, 2146, 2150; Hearings, House Committee on Education and Labor on H. R. 8, 80th Cong., 1st Sess., pp. 350, 2260. The failure of the Railway Labor Act amendments to exempt the member who did not choose to have his contributions put to such uses may have reflected difficulties in drafting an exempting clause. See Hearings, Subcommittee of the Senate Committee on Labor and Public Welfare on S. 3295, 81st Cong., 2d Sess., pp. 173–174. But in 1958, the Senate voted down a proposal to enable an

---

[30] See Proceedings of the AFL–CIO Constitutional Convention, Vol. II, pp. 183–192 (1959).

A recent leader of the London Times which reviewed the annual report of the British Trade Unions Council noted that the document concerned itself with "Few . . . political subjects . . . which have not their industrial sides." The London Times, Aug. 23, 1960, p. 9, col. 2.

individual union member to recover any portion of his dues not expended for "collective bargaining purposes." 104 Cong. Rec. 11330–11347.

Congress is, of course, free to enact legislation along lines adopted in Great Britain, whereby dissenting members may contract out of any levies to be used for political purposes.[31] "At the point where the mutual advantage of association demands too much individual disadvantage, a compromise must be struck. . . . When that point has been reached—where the intersection should fall—is plainly a question within the special province of the legislature. . . . Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. . . . But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from

[31] The course of legislation in Great Britain illustrates the various methods open to Congress for exempting union members from political levies. As a consequence of a restrictive interpretation of the Trade Union Act of 1876, 39 & 40 Vict., c. 22, by the House of Lords in *Amalgamated Society of Ry. Servants* v. *Osborne,* [1910] A. C. 87, Parliament in 1913 passed legislation which allowed a union member to exempt himself from political contributions by giving specific notice. Trade Union Act of 1913, 2 & 3 Geo. V, c. 30. The fear instilled by the general strike in 1926 caused the Conservative Parliament to amend the "contracting out" procedure by a "contracting in" scheme, the net effect of which was to require that each individual give notice of his consent to contribute before his dues could be used for political purposes. Trade Disputes and Trade Unions Act of 1927, 17 & 18 Geo. V, c. 22. When the Labor Party came to power, Parliament returned to the 1913 method. Trade Disputes and Trade Unions Act of 1946, 9 & 10 Geo. VI, c. 52. The Conservative Party, when it came back, retained the legislation of its opponents.

those on whom in a democratic society it ultimately rests—the people." *American Federation of Labor* v. *American Sash & Door Co.,* 335 U. S. 538, 546, 553 (concurring opinion).

In conclusion, then, we are asked by union members who oppose these expenditures to protect their right to free speech—although they are as free to speak as ever—against governmental action which has permitted a union elected by democratic process to bargain for a union shop and to expend the funds thereby collected for purposes which are controlled by internal union choice. To do so would be to mutilate a scheme designed by Congress for the purpose of equitably sharing the cost of securing the benefits of union exertions; it would greatly embarrass if not frustrate conventional labor activities which have become institutionalized through time. To do so is to give constitutional sanction to doctrinaire views and to grant a miniscule claim constitutional recognition.

In *Everson* v. *Board of Education,* 330 U. S. 1, the legislative power of a State to subsidize bus service to parochial schools was sustained, although the Court recognized that because of the subsidy some parents were undoubtedly enabled to send their children to church schools who otherwise would not. It makes little difference whether the conclusion is phrased so that no establishment of religion was found, or whether it be more forthrightly stated that the merely incidental "establishment" was too insignificant. Figures of the Department of Health, Education and Welfare show that the yearly cost of transportation to non-public schools in Massachusetts totals approximately $659,749; in Illinois $1,807,740.[32] These are scarcely what would be termed negligible expenditures. Some might consider the resulting "establishment" more

---

[32] Statistics of State School Systems, 1955–1956: Organization, Staff, Pupils, and Finances, c. 2, p. 70 (U. S. Department of Health, Education, and Welfare, 1959).

substantial than the loss of free speech through the payment of $3 per month for union dues, whereby a dissident member feels identified in his own mind with the union's position.

The words of Mr. Justice Cardozo, used in a different context, are applicable here: "[C]ountless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by." *Gully* v. *First National Bank,* 299 U. S. 109, 118.

I would reverse and remand the case for dismissal in the Georgia courts.